AMERICAN MULTI-CINEMA, INC., Plaintiff-Appellant, v. THE CITY OF WARRENVILLE, Defendant-Appellee.

Second District    No. 2—00—0701

Opinion filed April 27, 2001.

James C. Schroeder, Daniel J. Delaney, Matthew B. Hinerfeld, and Allan

Erbsen, all of Mayer, Brown & Platt, of Chicago, and Robert J. Schillerstrom and John R. Wieser, both of Law Office of Robert J. Schillerstrom, Ltd., of Naperville, for appellant.

John N. Pieper, of Wheaton, for appellee.

JUSTICE RAPP delivered the opinion of the court:

Plaintiff, American Multi-Cinema, Inc. (AMC), brought an action in the circuit court of Du Page County challenging the constitutionality of an ordinance enacted by defendant, City of Warrenville (City), imposing an amusement tax. AMC appeals from the order of the circuit court granting the City's motion for summary judgment and denying AMC's cross-motion for summary judgment. We affirm.

## I. FACTS

In March 1997, the City adopted Ordinance No. 1566 (ordinance) entitled "Ordinance Creating an Amusement Tax and Amending the City Code in Accordance Therewith (City of Warrenville, Ordinance No. 1566 (eff. January 1, 1998))." The ordinance was enacted pursuant to section 11—42—5 of the Illinois Municipal Code (65 ILCS 5/11—42—5 (West 1996)) and imposes a 2% tax on the gross receipts for admission fees for "amusements," which the ordinance defines as:

"Any and all spectator and exhibitive entertainment, including but not necessarily limited to the following activities: any movie; theatrical, dramatic, musical or spectator performance; carnival; circus; rodeo; animal act; amusement ride; amusement attraction; game; or animal show." City of Warrenville, Ordinance No. 1566 (eff. January 1, 1998).

The ordinance took effect in January 1998. Until that time the City did not tax amusements and had no movie theaters. The mayor and members of the city council have, on occasion, referred to the ordinance as the "AMC amusement tax."

In 1996 and early in 1997, prior to adoption of the ordinance, AMC had purchased land and finalized plans to construct a 30-screen theater in the City. AMC's theater, called the AMC Cantera 30, opened in March 1998 and has been in continuous operation since that time. AMC has chosen to pay the tax from gross revenues rather than increasing ticket prices. AMC has paid more than 99% of the taxes collected by the City pursuant to the ordinance.

AMC originally presented this case to the trial court in a two-count complaint brought under section 1983 of the Civil Rights Act (42 U.S.C. § 1983 (1994)) seeking declaratory and injunctive relief. The trial court dismissed the complaint because it found that an adequate remedy existed under state law.

AMC filed an amended complaint on April 30, 1999. Counts I and II sought declaratory and injunctive relief under state law. Specifically, AMC alleged that the amusement tax violates the first and fourteenth amendments to the United States Constitution (U.S. Const., amends. I, XIV) because it impermissibly targets expressive conduct for special tax treatment but excludes other activities from such taxes. AMC prayed for a declaration that the amusement tax is unconstitutional, for an order enjoining further collection of the amusement tax, and for a refund of previously paid amusement taxes. In counts III and IV, AMC sought the same relief pursuant to sections 1983 and 1988 of the Civil Rights Act (42 U.S.C. §§ 1983, 1988 (1994)) to the extent that such relief was unavailable under state law.

The parties each sought summary judgment, agreeing that there were no genuine issues of material fact as to the allegations in AMC's complaint. The City argued that the ordinance was enacted pursuant to state law, is content neutral, and has been uniformly applied. With its motion for summary judgment, the City filed the affidavit of Jean McCabe, finance director for the City. According to the affidavit, AMC had paid $188,642.70 since the ordinance was enacted. The City also received payment of amusement tax from four additional entities, including Acorn Coffee Bar of the Folk Lore Center ($211.48); Avalanche II Sports Bar and Grill ($323.56); The Corner Cue ($64.44); and Satisfied Frog Sports Bar and Grill ($99.05).

In its cross-motion for summary judgment, AMC argued that it was entitled to summary judgment because the ordinance targets expressive conduct for special tax treatment, the ordinance applies exclusively to AMC, and the City has no compelling governmental interest to justify the tax. AMC pointed to admissions made by the City that Acorn Coffee Bar paid an additional $14.06 and Satisfied Frog an additional $47.30 in April 1999, bringing the amusement tax totals for these two entities to $225.54 and $146.35, respectively.

The parties filed briefs in support of their motions for summary judgment, and the trial court heard oral argument. In granting the City's motion and denying AMC's motion, the trial court stated:

"There is nothing that appears to this Court to require the highest level of scrutiny of the First Amendment tests. The ordinance that has been passed *** is a content-neutral tax. There is no exemption for any type of expression which would promote or suppress any particular type of expression. It is fairly broad in its definition of amusement, and I think that [counsel for the City] is correct that it's simply the forces of the marketplace that make it fall more heavily on one entity than on any other.

However, as [the City's counsel] has said, there are other busi-

ness entities which are proportionally taxed and affected. But it is the force of the marketplace that makes it fall \*\*\* in a more burdensome fashion on AMC. But that fact alone does not render this a violation of the First Amendment.

I believe that *Leathers* is controlling. And in this particular situation, since there is nothing that appears to regulate the content of any of the motion pictures that are exhibited or would even threaten to regulate the content in any realistic and meaningful fashion, that the specific legislation \*\*\* is not violative of any Constitutional protection, specifically does not violate the First amendment."

AMC filed a timely notice of appeal.

## II. DISCUSSION

■ We begin by noting that, although AMC's notice of appeal references the order dismissing counts I and II of the complaint, which were realleged in the amended complaint as counts III and IV, AMC makes no argument concerning these counts on appeal. Accordingly, these counts have been abandoned and any arguments thereunder are waived. See *Old Kent Bank-St. Charles N.A. v. Surwood Corp.*, 256 Ill. App. 3d 221, 230 (1994).

On appeal, AMC argues that the trial court should have applied strict scrutiny in evaluating the constitutionality of the ordinance and that under strict scrutiny the ordinance violates the first amendment. Alternatively, AMC argues that the trial court erred in its application of intermediate scrutiny. AMC prays for the reversal of the trial court's order granting summary judgment in favor of the City and for judgment in AMC's favor.

The City urges us to affirm the trial court, arguing that the trial court applied the appropriate level of scrutiny and that the trial court's holding that the ordinance does not violate the first amendment was proper.

■ Accordingly, we must decide whether the trial court applied the appropriate level of judicial scrutiny and, if so, whether the ordinance satisfies that scrutiny. We conduct a *de novo* review of an order granting summary judgment. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 30 (1999). In ruling on the motion, the court is required to construe all evidentiary material strictly against the movant and liberally in favor of the respondent. *Laurel Motors, Inc. v. Airways Transportation Group of Cos.*, 284 Ill. App. 3d 312, 316 (1996). A trial court's ruling with respect to the constitutionality of a statute is reviewed *de novo*. *Russell v. Department of Natural Resources*, 183 Ill. 2d 434, 441 (1998). We may affirm the trial court's ruling on any basis supported by the record. *Messenger v. Edgar*, 157 Ill. 2d 162, 177 (1993).

## A. The Appropriate Level of First Amendment Scrutiny

■ The City enacted the amusement tax pursuant to section 11—42—5 of the Illinois Municipal Code (65 ILCS 5/11—42—5 (West 1996)), which grants municipalities the specific power to license, tax, and regulate amusements and places of amusement. See *Chicago Health Clubs, Inc. v. Picur*, 124 Ill. 2d 1, 12 (1988). AMC contends that the City did not exercise its authority under this enabling statute in a constitutional manner because the amusement tax violates AMC's first amendment rights.

■ ■ The first amendment to the United States Constitution provides that "Congress shall make no law *** abridging the freedom of speech, or of the press ***." U.S. Const., amend. I. The first amendment is incorporated into the due process clause of the fourteenth amendment and thereby made applicable to the states. *Stromberg v. California*, 283 U.S. 359, 368, 75 L. Ed 1117, 1122-23, 51 S. Ct. 532, 535 (1931). "[E]xpression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502, 96 L. Ed. 1098, 1106, 72 S. Ct. 777, 781 (1952). Although it is constitutional to tax first amendment activities in a genuinely nondiscriminatory fashion (*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229, 95 L. Ed. 2d 209, 219, 107 S. Ct. 1722, 1727 (1987)), the Supreme Court in *Leathers v. Medlock*, 499 U.S. 439, 113 L. Ed. 2d 494, 111 S. Ct. 1438 (1991), identified three situations where a tax imposed by government will trigger strict scrutiny under the first amendment. First, "[a]bsent a compelling justification, the government may not exercise its taxing power to single out the press." *Leathers*, 499 U.S. at 447, 113 L. Ed. 2d at 503, 111 S. Ct. at 1443. Second, "[a] tax is also suspect if it targets a small group of speakers." *Leathers*, 499 U.S. at 447, 113 L. Ed. 2d at 503-04, 111 S. Ct. at 1443. Finally, "a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech." *Leathers*, 499 U.S. at 447, 113 L. Ed. 2d at 504, 111 S. Ct. at 1444.

It is undisputed that the ordinance involved in this case is content neutral as written. AMC does not contend that the amusement tax is the product of censorial motive or that it is facially content based. There is nothing in the language of the ordinance that refers to the content of the films shown. Accordingly, we are concerned only with whether the ordinance imposes a differential tax or, put another way, whether the amusement tax discriminates against first amendment speakers.

AMC relies primarily on *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 75 L. Ed. 2d 295, 103

S. Ct. 1365 (1983), in support of its argument that the trial court should have applied strict scrutiny in assessing the ordinance.

At issue in *Minneapolis Star* was a Minnesota special use tax on the cost of paper and ink products consumed in the production of publications. *Minneapolis Star*, 460 U.S. at 577, 75 L. Ed. 2d at 300, 103 S. Ct. at 1368. The Minnesota legislature exempted from the tax the first $100,000 worth of ink and paper consumed by a publication in a year. *Minneapolis Star*, 460 U.S. at 578, 75 L. Ed. 2d at 300, 103 S. Ct. at 1368. As a result, 11 publishers, producing 14 of 368 newspapers, incurred a tax liability. *Minneapolis Star*, 460 U.S. at 578, 75 L. Ed. 2d at 300, 103 S. Ct. at 1368. The Star Tribune paid roughly two-thirds of the total revenue raised by the tax. *Minneapolis Star*, 460 U.S. at 578, 75 L. Ed. 2d at 300, 103 S. Ct. at 1368. The Star Tribune challenged the imposition of the use tax as a violation of the guarantees of freedom of the press and equal protection in the first and fourteenth amendments. *Minneapolis Star*, 460 U.S. at 579, 75 L. Ed. 2d at 300, 103 S. Ct. at 1368.

The *Minneapolis Star* court noted that government can subject newspapers to generally applicable economic regulations without violating the constitution, but concluded that Minnesota created a special tax that "is facially discriminatory" in that it singles out publications protected by the first amendment. *Minneapolis Star*, 460 U.S. at 581, 75 L. Ed. 2d at 302, 103 S. Ct. at 1369-70. The Supreme Court explained that Minnesota "has singled out the press for special treatment." *Minneapolis Star*, 460 U.S. at 582, 75 L. Ed. 2d at 303, 103 S. Ct. at 1370.

In explaining the problematic nature of differential taxation, the Supreme Court stated:

"A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. [Citation.] When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star*, 460 U.S. at 585, 75 L. Ed. 2d at 304-05, 103 S. Ct. at 1371-72.

The Supreme Court then concluded that strict scrutiny applies:

> "Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Minneapolis Star*, 460 U.S. at 585, 75 L. Ed. 2d at 305, 103 S. Ct. at 1372.

The Supreme Court then found that Minnesota's interest in raising revenue standing alone could not justify the special treatment of the press because an alternative means of achieving the same goal without raising first amendment concerns was available. *Minneapolis Star*, 460 U.S. at 586, 75 L. Ed. 2d at 305, 103 S. Ct. at 1372.

The second reason the *Minneapolis Star* court held that ·strict scrutiny applied and that the use tax violated the first amendment was that the tax targeted a small group of newspapers. The court explained:

> "Whatever the motive of the legislature in this case, we think that recognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme." *Minneapolis Star*, 460 U.S. at 591-92, 75 L. Ed. 2d at 309, 103 S. Ct. at 1375.

*Minneapolis Star* teaches that strict judicial scrutiny applies to differential tax legislation that (1) singles out first amendment actors as a whole; or (2) singles out a subgroup of first amendment actors.

In this case, the ordinance does not single out first amendment activities; rather, it has a broad application. The ordinance taxes amusements, which it defines as:

> "Any and all spectator and exhibitive entertainment, including but not necessarily limited to the following activities: any movie; theatrical, dramatic, musical or spectator performance; carnival; circus; rodeo; animal act; amusement ride; amusement attraction; game; or animal show." City of Warrenville, Ordinance No. 1566 (eff. January 1, 1998).

Although many of these types of amusements include expression protected by the first amendment (see *Winters v. New York*, 333 U.S. 507, 510, 92 L. Ed. 840, 847, 68 S. Ct. 665, 668-69 (1948) (protected speech is not limited solely to the expression and communication of ideas, but may include forms of expression that also entertain)), others do not. We do not find, nor does AMC argue, that the amusement tax facially discriminates against only first amendment actors. AMC is subject to the amusement tax because AMC is a business engaged in amusements, not because AMC is a first amendment actor. The ordinance is not a differential tax but, rather, a tax that applies generally to all amusements as defined by the ordinance.

■ AMC contends that the ordinance is subject to strict scrutiny under *Minneapolis Star* because the amusement tax singles out AMC and creates impermissible governmental leverage over AMC's constitutionally protected speech. We disagree.

AMC contends that the record clearly shows that the amusement tax was motivated by the City's desire to tax AMC. In support of this contention, AMC points out that no amusement tax existed in the City until AMC started building its theater; the effective date of the ordinance roughly coincided with the opening of AMC's theater; City officials have publically referred to the ordinance as the "AMC Entertainment Tax" and the "AMC amusement tax"; the City did not enforce the tax against other entities engaged in amusement until AMC threatened legal action; and even when five other entities began to pay the tax, AMC still bore over 99% of the burden.

AMC confuses the permissible targeting of a revenue source with the impermissible targeting of a first amendment speaker. Even if AMC was targeted by the City as a revenue source, as the timing of the ordinance and comments by City officials indicate, the ordinance itself is not tailored to single out AMC or movie theaters as a group of first amendment actors. As noted above, the ordinance applies to all amusements within the City. The ordinance also applies to all movie theaters; AMC's Cantera 30 just happens to be the only theater in the City.

We agree with the trial court's conclusion that it is the happenstance of the marketplace in the City that causes the brunt of the tax to land upon AMC, not the structure of the ordinance. While the legislation at issue in *Minneapolis Star* was tailored to single out a few members of the press, namely, publications that consume more than $100,000 worth of paper and ink, the City's ordinance is not tailored to differentiate between large and small theaters or to single out any first amendment actor. The ordinance would operate in the same fashion if the City contained 30 one-screen theaters rather than AMC's one 30-screen theater.

Further, AMC has paid more than 99% of the amusement tax because of the market conditions in the City, not because of the structure of the ordinance imposing the amusement tax. The other entities engaged in amusement in the City are taxed the same percentage of gross receipts but apparently do much less business. AMC bears more than 99% of the amusement tax burden simply because AMC has enjoyed more than 99% of the amusement business within the City. *Minneapolis Star* prohibits government from tailoring legislation that singles out a first amendment speaker for differential tax treatment. *Minneapolis Star*, 460 U.S. at 591-92, 75 L. Ed. 2d at 309,

103 S. Ct. at 1375. However, *Minneapolis Star* does not prohibit the enactment of a content-neutral and facially nondiscriminatory tax that primarily impacts one first amendment actor due to market conditions rather than the structure of the legislation.

The City's failure to enforce the tax against other entities engaged in amusement until AMC threatened legal action does not change our conclusion. Under an equal protection analysis, our supreme court has held that the lax enforcement of a municipal amusement tax did not render the enacting ordinance invalid because there was no showing of intentional or purposeful discrimination. *Kerasotes Rialto Theater Corp. v. City of Peoria*, 77 Ill. 2d. 491, 499-500 (1979). The lax enforcement of the ordinance against the other entities engaged in amusement and the fact that the City did not impose an amusement tax on these entities before AMC built its theater show that the City targeted AMC as a revenue source. It does not show intentional discrimination of first amendment activities and does not render the ordinance differential.

Because we conclude that the ordinance is content neutral and does not impose a differential tax, we hold that the trial court did not err in failing to apply strict judicial scrutiny in analyzing the constitutionality of the ordinance.

## B. The Application of the Appropriate Level of Scrutiny

■ The record shows that the trial court did not apply the highest level of judicial scrutiny in finding the ordinance constitutional; however, it is not clear what level of scrutiny the trial court did apply. The City urges us to apply an intermediate level of scrutiny. Where an ordinance is content neutral and imposes an incidental burden on speech, the appropriate level of scrutiny used to evaluate its constitutionality is intermediate. See *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 662, 129 L. Ed. 2d 497, 530, 114 S. Ct. 2445, 2469 (1994). AMC argues that the ordinance does not withstand even intermediate scrutiny.

Under intermediate scrutiny, a content-neutral regulation will be sustained if:

> " 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Turner Broadcasting*, 512 U.S. at 662, 129 L. Ed. 2d at 530, 114 S. Ct. at 2469, quoting *United States v. O'Brien*, 391 U.S. 367, 377, 20 L. Ed. 2d 672, 680, 88 S. Ct. 1673, 1679 (1968).

■ We need not consider whether the ordinance withstands an intermediate level of scrutiny because we hold that the ordinance at is-

sue does not burden speech. Therefore, the ordinance should be evaluated under a rational basis level of scrutiny.

■ Unless legislation operates to disadvantage a suspect class or infringes upon a fundamental right, the legislation, to be upheld as constitutional, must simply bear a rational relationship to a legitimate governmental interest. *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 368 (1985). Freedom of speech is a fundamental right protected by the first amendment. See *Near v. Minnesota*, 283 U.S. 697, 706, 75 L. Ed. 1357, 1361-62, 51 S. Ct. 625, 628 (1931). However, no rights under the first amendment are abridged by the ordinance. As we stated above, the ordinance is content neutral, does not differentiate first amendment actors from nonfirst amendment actors, and is not tailored to discriminate against a small group or even one first amendment actor. The state may apply general business taxes without violating the first amendment, even though some of these business activities relate to free speech. See *Minneapolis Star*, 460 U.S. at 581, 75 L. Ed. 2d at 302, 103 S. Ct. at 1369; *Arkansas Writers' Project*, 481 U.S. at 229, 95 L. Ed. 2d at 219, 107 S. Ct. at 1727. Accordingly, the amusement tax does not impose a burden on free speech and must only withstand the rational basis test.

■ The issue we are left with is whether there is a rational basis to tax businesses engaged in amusement. The only interest asserted by the City for imposing the amusement tax is to raise revenue. Raising revenue is critical to government. *Minneapolis Star*, 460 U.S. at 586, 75 L. Ed. 2d at 305, 103 S. Ct. at 1372. Statutes bear a strong presumption of constitutionality, and the burden of proving invalidity is on the party challenging the enactment. *Chicago Tribune Co. v. Johnson*, 106 Ill. 2d 63, 71 (1985). Broad latitude is afforded to legislative classifications for taxing purposes. *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 250 (1996).

According to the record, the AMC Cantera 30 theater had 1,785,347 paid admissions between March 1998 and April 1999. Even when the record is construed strictly against the City and liberally in favor of AMC (see *Laurel Motors*, 284 Ill. App. 3d at 316), we cannot conclude that there is no rational relationship between the increased burden on local government as a result of commercial entertainment and the need to raise revenue to meet that burden. We hold that there is a rational basis for the City's amusement tax and therefore the ordinance is constitutional.

## III. CONCLUSION

For the foregoing reasons the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

GROMETER and CALLUM, JJ., concur.