**CINAMERICA THEATRES, L.P.; Cinema Saver Theatre Corporation; and United Artist Theatre Circuit, Inc., Plaintiffs–Appellants,**

v.

**CITY OF BOULDER, a political subdivision of the State of Colorado, and Stephen T. Honey, an individual, solely in his capacity as the City Manager of the City of Boulder, Defendants–Appellees.**

No. 01CA0374.

Colorado Court of Appeals, Div. V.

May 9, 2002.

Joseph H. Thibodeau, P.C., Joseph H. Thibodeau, Denver, CO; Barry J. London, Sunriver, OR, for Plaintiffs–Appellants.

Joseph N. de Raismes, III, City Attorney, Alan E. Boles, Jr., First Assistant City Attorney, Boulder, CO, for Defendants–Appellees.

Opinion by Judge DAVIDSON.

Plaintiffs, Cinamerica Theatres, L.P., Cinema Saver Theatre Corporation, and United Artist Theatre Circuit, Inc., appeal from the judgment entered in favor of defendants, City of Boulder and Stephen T. Honey as City Manager of the City of Boulder, applying an intermediate scrutiny standard to determine that the Boulder admissions tax, B.R.C. § 3–4–1, et seq. (1981), is not unconstitutional as applied to plaintiffs. We affirm.

Under B.R.C. § 3–4–2, the City imposes an excise tax of five percent on the "price paid to gain admission to any place or event in the city that is open to the public." The term "place or event open to the public" is defined as:

[A]ny place or event, the admission or access to which is open to members of the public upon payment of a charge or fee. This term includes, without limitation, the following places and events when a charge or fee for admission to such places and events is imposed upon members of the public:

(1) Any performance of a motion picture, stage show, play, concert, or other manifestation of the performing arts;

(2) Any sporting or athletic contest, exhibition, or event, whether amateur or professional;

(3) Any lecture, rally, speech, or dissertation;

(4) Any showing, display, or exhibition of any type, such as an art exhibition; and

(5) Any restaurant, tavern, lounge, bar, or club, whether the admission is called a "cover charge," "door charge," or any other such term.

B.R.C. § 3–1–1.

The tax is imposed upon the person who pays to gain admission, but is to be collected by the person charging admission. B.R.C. § 3–4–3. However, rather than charging its customers the amount of the tax, plaintiffs chose to pay the tax out of general operating revenue. While the tax is imposed on other activities in the City at the same rate, plaintiffs' movie theaters paid between approximately fifty-eight and seventy-seven percent of the total tax collected by the City in the years 1993–1997.

Each plaintiff filed a claim for a refund of the amount of tax paid, which the City denied. Plaintiffs brought an action seeking a review of that denial pursuant to C.R.C.P. 106(a)(4). Plaintiffs also filed an action seeking a declaration that the Boulder admissions tax is unconstitutional as applied and an injunction prohibiting the City from enforcing or collecting the tax. The trial court consolidated the two actions.

This is the second time this case has come before this court. Initially, the trial court granted defendants' cross-motion for summary judgment. It applied an intermediate scrutiny standard, determining that the tax was constitutional and affirming the City's administrative decision denying plaintiffs' claims for refunds. In the first appeal, a division of this court determined that, although the tax is neutral on its face, a strict scrutiny standard might be appropriate if the tax were content based in application. The division remanded the case for additional

factfinding and directed the trial court to determine:

> whether the tax is being applied disproportionately to a small group of businesses engaged in protected activity; if so, whether this triggers the strict scrutiny test, rather than the intermediate scrutiny test; and after application of the appropriate standard, whether the tax is violative of the Theatres' constitutional rights.

*Cinamerica Theatres, L.P. v. City of Boulder,* (Colo.App. No. 98CA0340, July 8, 1999)(not selected for official publication)(*Cinamerica I* ).

The trial court determined on remand that the tax is not content based in application, the intermediate scrutiny standard is appropriate, and the tax is not unconstitutional. This second appeal followed.

Plaintiffs' primary contention on appeal is that the trial court erred in applying an intermediate scrutiny standard. We perceive no error.

▄▄ Generally, the standard of review for laws burdening First Amendment rights is determined by first examining whether the laws are content based. "[R]egulations that suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to strict scrutiny, while "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497, 517 (1994). *See also Denver Publ'g Co. v. City of Aurora,* 896 P.2d 306 (Colo.1995). However, in cases dealing with taxation of the press, strict scrutiny may be applied in certain circumstances even when a provision is content neutral. *See Leathers v. Medlock,* 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

Plaintiffs specifically rely on *Minneapolis Star, supra,* to contend that a strict scrutiny standard is applicable and that the admissions tax is unconstitutional as applied because it is imposed "almost exclusively" on a small number of taxpayers that are engaged in activities likely to be protected by the First and Fourteenth Amendments to the U.S. Constitution and article II, section 10 of the Constitution of the State of Colorado. We disagree.

## I.

*Minneapolis Star* is one of a series of Supreme Court cases involving selective taxation of the press. Prior to *Minneapolis Star,* the Supreme Court invalidated a tax on advertisements that was imposed solely on newspapers over a certain circulation size, noting:

> The form in which the tax is imposed is in itself suspicious. It is not measured or limited by the volume of advertisements. It is measured alone by the extent of the circulation of the publication in which the advertisements are carried, with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers.

*Grosjean v. American Press Co.,* 297 U.S. 233, 251, 56 S.Ct. 444, 449, 80 L.Ed. 660, 669 (1936).

*Minneapolis Star* involved a use tax imposed on the paper and ink used in publications, with an exemption for the first $100,000 of ink and paper. The Supreme Court first noted that *Grosjean* was not dispositive because the result there was attributable, at least in part, to improper motives on the part of the enacting legislature. Absent any evidence of improper motivations on the part of the Minnesota legislature, the Court nevertheless found the tax to be unconstitutional on two other grounds. First, it was facially discriminatory in that it was not a generally applicable tax, but was a "special tax" imposed only on certain publications protected by the First Amendment and was the only tax imposed on nonretail sales. Second, the $100,000 exemption had the effect of targeting a small subset of newspapers for taxation without a legitimate justification, "[a]nd when the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Minneapolis*

*Star, supra,* 460 U.S. at 592, 103 S.Ct. at 1375, 75 L.Ed.2d at 309.

A subset of a particular type of press, namely magazines, was also targeted in *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), which involved a sales tax exemption for religious, professional, trade, and sports journals, but not other magazines. The Supreme Court found this scheme to be "a more disturbing use of selective taxation than *Minneapolis Star,* because the basis on which Arkansas differentiates between magazines is particularly repugnant to First Amendment principles: a magazine's tax status depends entirely on its content." *Arkansas Writers' Project, Inc. v. Ragland, supra,* 481 U.S. at 229, 107 S.Ct. at 1728, 95 L.Ed.2d at 219–20.

Subsequently, the Supreme Court decided *Leathers v. Medlock, supra,* which involved a sales tax exemption for newspapers, magazines, and, for a time, satellite television, but not for cable television. The Court addressed the question whether a tax imposed on only selected segments of the media violated the First Amendment. In first discussing *Grosjean, Minneapolis Star,* and *Arkansas Writers' Project,* the Court noted that there are three general situations in which strict scrutiny is appropriate:

> These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.

*Leathers v. Medlock, supra,* 499 U.S. at 447, 111 S.Ct. at 1443–44, 113 L.Ed.2d at 503–04 (citations omitted).

The Court in *Leathers* found that none of these three types of discrimination was present, noting that the tax was a general sales and use tax and did not single out the press; it was not imposed only on some cable and satellite systems; it was not content based; there was "no indication ... that Arkansas has targeted cable television in a purposeful attempt to interfere with its First Amendment activities"; and the tax was not "structured so as to raise suspicion that it was intended to do so." *Leathers, supra,* 499 U.S. at 448, 111 S.Ct. at 1444, 113 L.Ed.2d at 504.

The Court in *Leathers* next addressed whether the fact that the tax was imposed on some First Amendment speakers, but not others, constituted "an additional basis" for concluding that the tax violated the plaintiffs' First Amendment rights. In finding that it did not, the Court held that "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Leathers, supra,* 499 U.S. at 453, 111 S.Ct. at 1447, 113 L.Ed.2d at 507–08.

■ *Grosjean, Minneapolis Star, Arkansas Writers' Project,* and *Leathers* each involved taxes imposed on the press, and the Court there relied, at least in part, on the role of the press "as a watchdog of government activity." *Leathers, supra,* 499 U.S. at 447, 111 S.Ct. at 1444, 113 L.Ed.2d at 504. While exhibition of commercial motion pictures is expression subject to protection under the First Amendment and article II, section 10 of the Colorado Constitution, *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); *Houston v. Manerbino,* 185 Colo. 1, 521 P.2d 166 (1974), it is not always considered to be a part of the "press." *See* David A. Anderson, *Freedom of the Press,* 80 Tex. L.Rev. 429 (Feb.2002). *But see In re Hearings Concerning Canon 35,* 132 Colo. 591, 593, 296 P.2d 465, 467 (1956)("freedom of the press is not confined to newspapers or periodicals, but is a right of wide import and '... in its

historic connotation comprehends every sort of publication which affords a vehicle of information and opinion' ").

In any event, other activities that plaintiffs allege are the target of the tax clearly fall into the category of "speech" rather than the "press," and for purposes of this appeal, we will assume, without deciding, that the reasoning of the Supreme Court cases applies not only to taxation of the press, but also to taxation of other protected speech. *See People v. Seven Thirty–Five E. Colfax, Inc.*, 697 P.2d 348 (Colo.1985)(article II, section 10 of the Colorado Constitution provides broader protection than the First Amendment).

## II.

Plaintiffs appear to concede that Boulder's admissions tax does not, on its face, single out movie theaters, apply only to a subset of movie theaters, or discriminate based on content. And, the tax applies to all places or events for which a price is charged for admission, regardless whether the activity involves protected speech and regardless of content. *See also Communications & Cable of Chicago, Inc. v. City of Chicago*, 282 Ill. App.3d 1038, 1050–51, 218 Ill.Dec. 200, 668 N.E.2d 1032, 1040 (1996)(amusement tax applied to a wide variety of activities and events found to be a tax of general applicability).

Plaintiffs contend, however, that the trial court erred in determining that, absent censorial motivation, the tax was not content based in operation and thus not unconstitutional as applied. We disagree.

■ Plaintiffs are correct that "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star, supra*, 460 U.S. at 592, 103 S.Ct. at 1376, 75 L.Ed.2d at 309. However, *Minneapolis Star* and other cases dispensing with proof of legislative intent to censor the press involved statutes that were differential or content based on their face, such that improper intent could be inferred. *Minneapolis Star, supra*, 460 U.S. at 585, 103 S.Ct. at 1372, 75 L.Ed.2d at 305 ("differential treatment, unless justified by some special characteristic of the press, suggests that the

goal of the regulation is not unrelated to suppression of expression"). *See also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)("Son of Sam" law was content based on its face, so evidence of improper censorial motive was unnecessary).

■ When, as here, the tax is generally applicable and content neutral on its face, it will not be subjected to strict scrutiny unless there is evidence of a legislative "interest in censoring the expressive activities" of the taxed speaker or evidence that the tax is "likely to stifle the free exchange of ideas." *Leathers, supra*, 499 U.S. at 453, 111 S.Ct. at 1447, 113 L.Ed.2d at 508.

■ Where an intent to censor expressive activities is shown, the regulation is deemed content based. "[E]ven a regulation neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys," and whether the purpose of a challenged provision is to regulate a particular message may be revealed in its design and operation. *See Turner Broad. Sys., Inc. v. FCC, supra*, 512 U.S. at 645, 114 S.Ct. at 2461, 129 L.Ed.2d at 520. *See also Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 738 (1st Cir.1995)(an ordinance is content based "if the municipality differentiates between speakers for reasons unrelated to the legitimate interests that prompted the regulation"); *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804–05 (D.C.Cir.1988)("Where legislation affecting speech appears underinclusive, i.e., where it singles out some conduct for adverse treatment, and leaves untouched conduct that seems indistinguishable in terms of the law's ostensible purpose, the omission is bound to raise a suspicion that the law's true target is the message."); *Regal Cinemas, Inc. v. City of Mayfield Heights*, 137 Ohio App.3d 61, 738 N.E.2d 42 (2000)(admissions taxes in four cities, under which movie theaters paid eighty-eight to one hundred percent of the tax, but other entities were also subject to the tax, was not structured in a way that indicated the cities' intent was to suppress certain ideas, and therefore strict scrutiny was not required).

■ On remand, the trial court found no indication from the design or operation of the tax that the City's purpose was to burden a particular message or that there was a threat of such a burden, despite the fact that plaintiffs paid the majority of the tax. We agree that there is no evidence in the record of actual or threatened suppression of, or a legislative intent to burden, particular ideas or viewpoints. There is no evidence that the tax was imposed selectively on plaintiffs' events, and plaintiffs were required to remit a high amount of tax solely because they enjoyed a correspondingly high amount of business. Thus, we also conclude that the tax is not content based in operation and does not demonstrate intent on the part of the City to burden plaintiffs' speech.

### III.

Plaintiffs contend, nevertheless, that strict scrutiny is required. Specifically, noting that ninety percent of the tax is collected from ten or fewer businesses and that plaintiffs pay between approximately fifty-eight and seventy-seven percent of the tax, plaintiffs contend that the tax is thus imposed on a small number of speakers, places a "disproportionate burden" on their First Amendment activities, and provides the "potential for abuse," such that strict scrutiny is automatically required under *Leathers* and *Minneapolis Star.* We disagree.

### A.

Although the majority in *Minneapolis Star* stated that the Minnesota tax violated the First Amendment because it "target[ed] a small group of newspapers," that tax was imposed on only a portion of all newspapers without a sufficient justification for the differential treatment. *Minneapolis Star, supra,* 460 U.S. at 591–92, 103 S.Ct. at 1375, 75 L.Ed.2d at 308–09.

Similarly, when the majority in *Leathers* referred to the total number of cable operators affected by the tax in determining that the tax did not resemble a penalty on a few speakers, it was noting only that the tax was structurally dissimilar to that in *Arkansas Writers' Project.* In contrast to the tax in *Arkansas Writers' Project,* which was limited

to only a few of the magazines in the state, the tax in *Leathers* was imposed uniformly on all "the approximately 100 cable systems then operating in the State." *Leathers, supra,* 499 U.S. at 448, 111 S.Ct. at 1444, 113 L.Ed.2d at 504. *See also Reuters Am., Inc. v. Sharp,* 889 S.W.2d 646, 652 (Tex.App. 1994)("the cases in which the Supreme Court found a state tax scheme to target a small group within the press involved discrimination within the same medium").

■ Here, the Boulder tax applies to all movie theaters that charge admission, regardless of their size or the content of movies shown. Thus, there is no intramedium discrimination and no impermissible targeting of a small group of speakers as occurred in *Minneapolis Star.*

### B.

■ Plaintiffs argue that, even in the absence of intramedium discrimination, impermissible differential treatment exists if the movie theaters paid most of the tax because the community lacked many other activities subject to the tax. They rely on several state court cases from other jurisdictions that arguably applied such a test, such as *United Artists Communications, Inc. v. City of Montclair,* 209 Cal.App.3d 245, 257 Cal. Rptr. 124 (1989)(admissions tax was unconstitutional burden where ninety percent of the tax was paid by two theaters and two adult bookstores, even though the tax applied to some other businesses); *Festival Enterprises, Inc. v. City of Pleasant Hill,* 182 Cal. App.3d 960, 227 Cal.Rptr. 601 (1986)(where a single theater paid all of the tax and there was no justification for imposing the tax solely on entertainment businesses, the tax violated the First Amendment); and *Forbes v. City of Seattle,* 113 Wash.2d 929, 785 P.2d 431 (1990)(admissions tax did not have a discriminatory impact on First Amendment activities where movie theaters accounted for only two dozen of several hundred entities subject to the tax and theaters paid only twenty percent of the total tax). We disagree.

■ We first note that each of these cases was decided prior to *Leathers*. Further, we agree with the trial court that "[w]hether the First Amendment is violated cannot depend on the quantity of events to which the public can purchase admission." Cases subsequent to those cited by plaintiffs have also rejected a test that is based solely on the number of taxpayers. *See Tucson Newspapers, Inc. v. City of Tucson,* 172 Ariz. 378, 837 P.2d 180 (Ariz.Ct.App.1992); *Am. Multi–Cinema, Inc. v. City of Warrenville,* 321 Ill.App.3d 349, 358, 255 Ill.Dec. 42, 748 N.E.2d 746, 753 (2001)("*Minneapolis Star* does not prohibit the enactment of a content-neutral and facially nondiscriminatory tax that primarily impacts one [F]irst [A]mendment actor due to market conditions rather than the structure of the legislation."); *Cox Cable Hampton Roads, Inc. v. City of Norfolk,* 242 Va. 394, 401, 410 S.E.2d 652, 655 (1991)(Such an interpretation "would virtually eliminate the ability of local governments to raise operating revenues through general taxation ordinances whenever there happened to be a single, or only a few, enterprises engaging in First Amendment activities.... The number of First Amendment speakers affected is not, in our opinion, the test established in *Leathers*.").

Contrary to plaintiffs' argument, *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), does not say otherwise. The Court in *Arcara* merely noted that heightened scrutiny was not limited to cases involving regulation of conduct containing an expressive element and cited the *Minneapolis Star* regulation of the purchase of paper and ink as an example.

### C.

■ Plaintiffs argue that even if the Boulder tax is broadly based and content neutral, and does not demonstrate any legislative intent to burden a particular viewpoint, a mere "potential" for future discrimination is sufficient to render the tax subject to strict scrutiny. They contend that such a potential exists here, arguing that because they pay most of the tax, the City could threaten to raise the tax based on a disagreement with their choice of movies to exhibit without the restraining force of having to impose a similar increase on other activities. This argument is closely related to plaintiffs' argument that strict scrutiny is required because the tax is imposed on a small number of taxpayers engaged in protected activities. Again, we disagree.

Most importantly, *Minneapolis Star* and other cases that relied on the dangers of differential taxation and the "potential for abuse" to impose a strict scrutiny standard involved taxes that either targeted the press or a portion thereof, rather than being generally applicable, or were content based, neither of which is the case here. As described in *Leathers*, the bases for subjecting a tax to strict scrutiny are limited to targeting the press as a whole, targeting only a small subset of a particular type of press, or discriminating based on content or with intent to suppress speech.

Plaintiffs present no persuasive authority to support the proposition that a statute which is content neutral and generally applicable is subject to strict scrutiny in the absence of evidence of an intent to burden a particular viewpoint or message, or a likelihood that such a burden will result. While each of the situations described in *Leathers* may present the "potential for abuse," that potential alone is not the test for application of strict scrutiny. *See Leathers, supra,* 499 U.S. at 449–50, 111 S.Ct. at 1445, 113 L.Ed.2d at 505 (rejecting idea that "intermedia and intramedia discrimination, even in the absence of any evidence of intent to suppress speech or of any effect on the expression of particular ideas, violates the First Amendment"); *Am. Multi–Cinema, Inc. v. City of Warrenville, supra* (absent evidence of intent to discriminate, tax was not subject to strict scrutiny even though a single movie theater paid ninety-nine percent of the tax and the city was lax in enforcing collection of the tax from other entities).

Additionally, we see little potential for abuse here. While plaintiffs allege that the tax is imposed "almost exclusively" on them, they acknowledge that it is also imposed on other activities, some protected by the First Amendment and others not. The other taxed places and events are as diverse as

Broadway-style dinner theater, live strip-tease and nude dancing, music concerts and live performances, theatrical performances, radio shows, ballet performances, dance parties, fundraising events, bars and nightclubs, and foot races. Any increase in the tax rate would also be borne by these other activities and events. Thus, contrary to plaintiffs' assertion, a restraining force exists to prevent the City from changing the tax based solely on plaintiffs' choice of movies to exhibit. Moreover, because the activities covered by the tax are so diverse, the tax does not affect a limited range of views and does not "threaten[ ] to suppress the expression of particular ideas or viewpoints." *See Leathers, supra*, 499 U.S. at 447, 111 S.Ct. at 1443, 113 L.Ed.2d at 503.

In sum, we conclude that the trial court correctly determined on remand that, even if plaintiffs in fact pay most of the admissions tax, the applicable standard is the intermediate scrutiny test. Furthermore, plaintiffs do not challenge the trial court's determination that, under that standard, the tax is not unconstitutional.

Accordingly, the judgment is affirmed.

Judge CASEBOLT and Judge NIETO concur.