2009 UT 73

BUSHCO, dba Babydolls Escorts; Valley Recreation, Inc. dba Kitty's Escorts and Angel's Escorts; The D. House, LLC dba The Doll House, Plaintiffs and Appellants,

v.

UTAH STATE TAX COMMISSION; Pam Hendrickson, R. Bruce Johnson, D'Arcy Dixon Pignanelli, and Mark B. Johnson (in their official capacities as members of the Utah State Tax Commission), Defendants and Appellees.

No. 20070559.

Supreme Court of Utah.

Nov. 20, 2009.

Rehearing Denied Feb. 2, 2010.

W. Andrew McCullough, Midvale, for plaintiffs.

Susan L. Barnum, Nancy L. Kemp, Salt Lake City, for defendant Utah State Tax Commission.

Nancy L. Kemp, Salt Lake City, for defendants Pam Hendrickson, R. Bruce Johnson, D'Arcy Dixon Pignanelli, and Mark B. Johnson.

Marina Baginsky Lowe, Salt Lake City, for amicus curiae ACLU Foundation of Utah.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶1 In 2004, the Utah legislature enacted the Sexually Explicit Business and Escort Service Tax[1] (the "Tax"), which imposes a 10 percent gross receipts tax on businesses whose employees or independent contractors (1) perform services while nude or partially nude for 30 days or more per year, or (2) provide companionship to another individual in exchange for compensation. The revenue generated by the Tax helps fund treatment

---

1. Utah Code Ann. §§ 59–27–101 to –108 (2008).

programs for convicted sex offenders and investigations of internet crimes against children.

¶2 Plaintiffs, a group of escort service agencies and erotic dancing clubs, challenge the Tax as a violation of their First Amendment rights under the United States Constitution. We hold that the statutory provisions imposing the Tax on businesses whose employees provide services while nude are constitutional as a content-neutral regulation of conduct that imposes de minimis burdens on protected expression. However, we conclude that the provisions applying the Tax to escort services are unconstitutionally vague.

## BACKGROUND

¶3 The Tax creates a mechanism for taxing businesses in which individuals perform services while nude or partially nude. Specifically, "[a] tax is imposed on a sexually explicit business equal to 10% of amounts paid to or charged by the sexually explicit business for ... (a) an admission fee; (b) a user fee; (c) a retail sale of tangible personal property made within the state; (d) a sale of ... food ...; (e) a sale of beverage; and (f) any service." [2] A sexually explicit business is defined as any business where a "nude or partially denuded" employee or contractor "performs any service: (a) personally on the premises of the sexually explicit business; (b) during at least 30 consecutive or nonconsecutive days within a calendar year" and is paid or compensated for such service.[3] To be "nude or partially denuded" means that "any of the following [is] less than completely and opaquely covered: (a) genitals; (b) the pubic region; or (c) a female breast below a point immediately above the top of the areola." [4]

¶4 The statute also provides for a tax on escort services. An escort service is "any person who furnishes or arranges for an escort to accompany another individual for: (a) companionship; and [for:] (b)(i) a salary; (ii) a fee; (iii) a commission; (iv) hire; (v) profit; or (vi) any amount similar to an amount listed in this Subsection 2(b)." [5] An escort is "any individual who is available to the public for the purpose of accompanying another individual" for compensated companionship.[6] "[A] tax is imposed on an escort service equal to 10% of amounts paid or charged by the escort service for any transaction that involves providing an escort to another individual." [7]

¶5 The proceeds from the Tax are to be split between the Department of Corrections, Adult Probation and Parole Division, and the Attorney General's office.[8] Specifically, portions of the proceeds are dedicated to "provide treatment services" to individuals convicted of sex offenses, including indigent or nonworking adults, other individuals who are subject to Adult Probation and Parole jurisdiction, and juveniles.[9] A portion of the fund is also designated for a task force that "investigates and prosecutes individuals who use the Internet to commit crimes against children." [10]

¶6 Plaintiffs, a group of escort service agencies and erotic dancing clubs, initiated this action against the Utah State Tax Commission (the "Commission") in 2004 by filing a complaint seeking (1) a declaratory judgment that the Tax was an unconstitutional burden on both their right to freedom of speech guaranteed by the First Amendment and their right to equal protection guaranteed by the Fourteenth Amendment; and (2) a permanent injunction against enforcement and collection of the Tax. Both parties moved for summary judgment. The district court granted the Commission's motion for summary judgment while denying Plaintiffs' motion. Specifically, the district court held that the Tax did not violate Plaintiffs' First

2. *Id.* § 59–27–103.

3. *Id.* § 59–27–102(4).

4. *Id.* § 59–27–102(3).

5. *Id.* § 59–27–102(2).

6. *Id.* § 59–27–102(1).

7. *Id.* § 59–27–103(2).

8. *Id.* § 59–27–105(4).

9. *Id.*

10. *Id.* § 59–27–105(4)(e).

Amendment rights because it was constitutional under *United States v. O'Brien.*[11] The court also found that the Tax did not violate the Equal Protection Clause of the Fourteenth Amendment because the Tax was rationally related to the legitimate government interest in providing treatment for sex offenders.[12]

¶ 7 Plaintiffs timely appealed the district court's grant of summary judgment to this court. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008).

## STANDARD OF REVIEW

■ ¶ 8 We review a grant of summary judgment for correctness, according no deference to the district court's decision.[13] The district court's determination that the Tax is constitutional is also a legal conclusion that we review for correctness.[14]

## ANALYSIS

¶ 9 In 1994, the city of Erie, Pennsylvania passed an ordinance making public nudity a criminal offense.[15] While the ordinance was a simple, generally applicable prohibition of public nudity on its face, it contained a preamble expressly acknowledging that the ordinance was adopted "for the purpose of limiting a recent increase in nude live entertainment within the City."[16] Additionally, Erie's city attorney stated that the ordinance "was not intended to apply to 'legitimate' theater productions."[17]

¶ 10 When the ordinance was challenged by nude dancing clubs as an unconstitutional burden on their First Amendment right to engage in erotic nude dancing, the United States Supreme Court upheld the ordinance, concluding that its predominant purpose was to advance the city's interest in limiting negative secondary effects—an interest unrelated to the substantive content of nude dancing expression.[18]

¶ 11 The similarities between this case and *Erie* are substantial and important. Like the *Erie* ordinance, the Tax is both generally applicable and neutral as to message. Also like the *Erie* ordinance, the Tax was enacted, according to the record before us, with the predominant purpose of serving an important state interest unrelated to the substantive content of protected expression. The Tax is also similar to the ordinance in *Erie* in that it places only de minimis burdens on erotic nude dancing, a type of expression lying "only within the outer ambit of the First Amendment's protection"[19] and "of a wholly different, and lesser, magnitude than the interest in untrammeled political debate."[20] The Tax is distinguishable from the ordinance upheld in *Erie* only in its form and in the fact that the Tax is, in all respects, less broad and less burdensome than the *Erie* ordinance.

¶ 12 We begin our analysis by evaluating the Tax's content neutrality and then assess whether it passes constitutional muster under the appropriate level of scrutiny. We determine that it does. We next turn to the question of whether the Tax is unconstitutionally overbroad and determine that it is not. We finish by analyzing whether the

11. 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

12. Plaintiffs have not pursued their equal protection argument on appeal.

13. *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1111–12 (Utah 1991).

14. *Snyder v. Murray City Corp.,* 2003 UT 13, ¶ 17, 73 P.3d 325 ("[B]ecause interpreting the ... Constitution presents a question of law, we review the trial court's determination for correctness and give no deference to its legal conclusions."); *see also Wood v. Univ. of Utah Med. Ctr.,* 2002 UT 134, ¶ 7, 67 P.3d 436 ("The issue of whether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court." (citation and internal quotations marks omitted)).

15. *Pap's A.M. v. City of Erie,* 553 Pa. 348, 719 A.2d 273, 275 (1998), *rev'd,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

16. *City of Erie v. Pap's A.M.,* 529 U.S. 277, 290, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (internal quotation marks omitted).

17. *Id.* at 292, 120 S.Ct. 1382.

18. *Id.* at 296, 302, 120 S.Ct. 1382.

19. *Id.* at 289, 120 S.Ct. 1382.

20. *Id.* at 294, 120 S.Ct. 1382.

statutory provisions applying the Tax to escort services are unconstitutionally vague and conclude that they are.

## I. THE TAX IS CONTENT NEUTRAL BECAUSE ITS APPLICATION IS TRIGGERED SOLELY BY CONDUCT, AND THE RECORD DOES NOT ESTABLISH THAT IT WAS ENACTED WITH THE PREDOMINANT PURPOSE OF SUPPRESSING PROTECTED EXPRESSION

¶ 13 A regulation of speech or expressive conduct is content neutral so long as the government interest underlying the regulation is not related to the suppression of protected expression.[21] A statute is "unrelated to the suppression of expression," and therefore content neutral, so long as it is both facially neutral [22] and does not have the "predominant" purpose of suppressing protected expression.[23]

¶ 14 Plaintiffs' contention that the Tax is an unconstitutional burden on their First Amendment rights is based primarily upon their assertion that the Tax is content based. We disagree and conclude that the Tax is facially neutral because its application is triggered without reference to the content of any protected expression. Additionally, the record before us does not establish that the Tax was enacted with the predominant purpose of suppressing protected expression.

### A. The Tax Regulates Nudity, Rather Than Nude Dancing, and Is Therefore Facially Content Neutral

¶ 15 The starting point for analysis of a regulation that impacts expressive conduct is the Supreme Court's decision in *United States v. O'Brien*, where the Court rejected the proposition that a "limitless variety of conduct" qualifies as speech simply because it is potentially expressive.[24] Because all conduct is potentially expressive, holding that each law regulating conduct implicates the First Amendment would largely eviscerate the distinction between conduct and speech.

¶ 16 Instead, the Court has recognized that regulations of conduct, so long as the conduct is not inherently expressive, should be treated as content neutral if the regulations are neutral as to message.[25] This is so because, in order to be content based, a regulation must classify based on the content of protected expression. A regulation that classifies based on unprotected

---

21. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (internal citation omitted)).

22. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (Kennedy, J., concurring) ("[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based.").

23. *See, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (noting that a finding that a statute's "predominant intent" was to limit negative secondary effects was "more than adequate to establish that the city's pursuit of its zoning interests here was unrelated to the suppression of free expression"); *see also Turner Broad. Sys. v.*

F.C.C., 512 U.S. 622, 646, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("[E]ven a regulation neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys.").

24. 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) ("It can be argued, of course, that almost limitless types of conduct—including appearing in the nude in public—are 'expressive,' and in one sense of the word this is true. People who go about in the nude in public may be expressing something about themselves by so doing. But the court rejected this expansive notion of 'expressive conduct' in *O'Brien* ....").

25. *See Schultz v. City of Cumberland*, 228 F.3d 831, 840–41 (7th Cir.2000); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (noting that nudity is not "an inherently expressive condition" and finding a public nudity ordinance content neutral).

conduct by definition does not classify based on protected expression and therefore is not content based. While regulations of unprotected conduct are still subject to First Amendment scrutiny when they burden protected expression,[26] they are scrutinized at a lower level since the concerns that prompt strict scrutiny are absent when conduct, rather than speech, is the triggering factor.[27]

■■ ¶ 17 In this case, application of the Tax is triggered by nudity, which the Supreme Court has specifically declared "is not an inherently expressive condition." [28] Because it is not inherently expressive, nudity is unprotected conduct rather than protected expression. Accordingly, in *Erie*, the Court "clarif[ied] that government restrictions on public nudity ... should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." [29] The Court rejected the argument that a ban on nudity was necessarily a ban on the message conveyed, distinguishing nudity as a means of expression rather than protected expression itself.[30]

¶ 18 Facially, at least in terms of the content-neutrality analysis, the Tax is indistin-guishable from the public nudity ordinance upheld in *Erie*. Like that ordinance, the Tax regulates the condition of nudity—not just specific instances of protected expression, like nude dancing.[31] Also like the *Erie* ordinance, the Tax applies or does not apply without reference to either protected expression or any particular message. The Tax simply cannot be facially content based because its trigger—nudity—is not "content" since it is not protected expression. On its face, therefore, the Tax is *conduct based,* rather than *content based,* and as such is facially content neutral.

**B. The Tax Is Also Content Neutral Because the Record Does Not Support Plaintiffs' Allegations That the Legislature's Predominant Purpose in Enacting the Tax Was to Suppress Protected Expression**

■ ¶ 19 Because the Tax is facially neutral, we must conclude that it is content neutral unless there is other evidence in the record establishing that the Tax, although neutral on its face, is predominantly a covert attempt to suppress protected expression.[32]

---

**26.** *See, e.g., O'Brien*, 391 U.S. at 376–77, 88 S.Ct. 1673; *see also Erie*, 529 U.S. at 289, 120 S.Ct. 1382.

**27.** *Turner Broad. Sys.*, 512 U.S. at 641–42, 114 S.Ct. 2445 ("[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." (internal citations omitted)).

**28.** *Erie*, 529 U.S. at 289, 120 S.Ct. 1382.

**29.** *Id.*

**30.** *Id.* at 292–93, 120 S.Ct. 1382 ("The public nudity ban certainly has the effect of limiting one particular means of expressing the kind of erotic message being disseminated at Kandyland. But simply to define what is being banned as the 'message' is to assume the conclusion.... Al-though there may be cases in which banning the means of expression so interferes with the message that it essentially bans the message, that is not the case here."); *see also Barnes*, 501 U.S. at 571, 111 S.Ct. 2456 ("[W]hile the dancing to which [the ordinance] was applied had a communicative element, it was not the dancing that was prohibited, but simply its being done in the nude.").

**31.** The tax applies to all businesses "at which any nude or partially denuded individual ... performs any service ... personally on the premises ... during at least 30 consecutive or nonconsecutive days within a calendar year...." Utah Code Ann. § 59–27–102(4) (2008). It does not differentiate between strip clubs and theaters or between escort services and artistic modeling agencies. The tax applies equally to all businesses providing nude services for the requisite period of time.

**32.** *Turner Broad. Sys.*, 512 U.S. at 645, 114 S.Ct. 2445 ("Our cases have recognized that even a regulation neutral on its face may be content-based if its manifest purpose is to regulate speech because of the message it conveys."); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 781–91, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("The principal inquiry in determining content-

While facial neutrality will not save a statute enacted with the predominant purpose of suppressing the expression of particular viewpoints or the discussion of certain subjects, the Supreme Court has repeatedly declined to infer an intent to suppress protected expression on the "basis of an alleged illicit motive."[33] There must be actual evidence in the record establishing that suppression of protected expression was the statute's predominant purpose.[34]

¶ 20 We find nothing in the record before us—either the Tax's legislative history or in the text of the Tax itself—establishing that the Tax was enacted with the predominant purpose of suppressing protected expression. While some individual legislators did express concern regarding whether the Tax was intended to target nude dancing clubs,[35] the legislative history does not establish that this was the Tax's predominant purpose. In fact, the Tax's sponsors consistently emphasized that the Tax was designed as a means to provide treatment for sex offenders.[36] As noted by the Supreme Court in O'Brien, in cases where a facially neutral statute is alleged to be content based because of statements found in the statute's legislative history, the reviewing court should be cautious in ascribing an impermissible motive to the enacting legislature:

neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.").

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is an entirely different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.[37]

The legislative record before us supports the conclusion that the predominant reason the Tax was enacted was to provide treatment for sex offenders, not to suppress protected expression.

¶ 21 Additionally, there is nothing in the text or structure of the Tax itself establishing that the legislature's predominant purpose in enacting the Tax was to suppress erotic nude dancing. The Tax is generally applicable; it applies to every business that employs nudity more than 30 days during the calendar year, regardless of whether that

33. See e.g., Erie, 529 U.S. at 292, 120 S.Ct. 1382.

34. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); see also Erie, 529 U.S. at 291–92, 120 S.Ct. 1382.

35. See, e.g., Hearing on H.B. 239 Before the H. Revenue & Taxation Standing Comm. (Feb. 3, 2004) (statement of Rep. Morgan Philpot) ("Why don't we take a stand whether it be through some form of task force that looks at this or just a bill that says this should be illegal? Because isn't that what we're really driving at here? ... We're basically saying these are social ills. They're wrong. But we're not actually coming out and saying we're making it so, and is it because of the constitutional nature of that challenge ...?"); Senate Floor Debate, H.B. 239, 55th Utah Leg., Gen. Sess. (March 2, 2004) (statement of Sen. Mike Dmitrich) ("[T]his is a

case where we're trying to put these businesses out of business.").

36. See, e.g., Hearing on H.B. 239 Before the H. Revenue & Taxation Standing Comm. (Feb. 3, 2004) (statement of Rep. Duane Bordeaux) ("I think, you know, to answer your question and to be very direct, well when you talk about the [moral] argument and are we trying to drive these out of business. They can open up ten more of these businesses, that's not my [mindset] here. Truly, the treatment side of it, I do think there's a contributing aspect of it that they can help pay. It's not to drive them out of business...."); Senate Floor Debate, H.B. 239, 55th Utah Leg., Gen. Sess. (March 2, 2004) (statement of Sen. Howard Stephenson) ("We're not moralizing here in passing this tax. We're not trying to even reduce these [businesses'] income. What we're attempting to do is fund the secondary effects that are associated with these kinds of businesses and these kinds of activities.").

37. O'Brien, 391 U.S. at 383–84, 88 S.Ct. 1673.

business employs nudity to convey an expressive message—erotic or otherwise.[38] Even if the burdens of the Tax, in practical effect, are likely to fall disproportionately on nude dancing clubs, the Tax is, in that regard, no different than the ordinance upheld in *Erie*. The major impact of the public nudity ordinance upheld in *Erie* surely fell upon businesses that employed nudity during their regular course of business. Yet this likely disparate impact was insufficient to render the ordinance content based.[39]

¶ 22 The only provision in the Tax that could be viewed as supporting the conclusion that the Tax was enacted with an intent to suppress erotic nude dancing is the 30–day exemption period.[40] One might view this exemption as evidence that the legislature intended to target nude dancing clubs—which are likely to feature erotic nude dancing on a consistent basis year round—over other businesses, such as theaters, that feature nudity only on an irregular basis. But this is only one interpretation of the purpose of the provision. One could also view the 30–day exemption period as an attempt to balance the state interest in providing sex offender treatment against the incidental burdens imposed on protected expression.[41]

¶ 23 Regardless of whether an intent to suppress protected expression can be inferred from the 30–day exemption period, any such inference is certainly less strong than the express statement found in the preamble of the *Erie* ordinance, which noted that the ordinance was prompted by concerns about an increase in nude live entertainment within the city.[42] The existence of this express statement in the text of the *Erie* ordinance itself was an insufficient basis for the Supreme Court to conclude that the ordinance was content based.[43]

¶ 24 In light of the Supreme Court's treatment of the analogous issue in *Erie*, the mere possibility that a *purpose* of the Tax was to target nude dancing clubs is insufficient to render the Tax content based. The record before us indicates that the Tax's *predominant purpose* was providing treatment for sex offenders, not the suppression of protected expression. Because the Tax is facially content neutral and the record does not establish that the legislature enacted it with the predominant purpose of suppressing protected expression, it is a content-neutral regulation of speech that we analyze under the intermediate scrutiny test set out in *O'Brien*.

## II. THE TAX PASSES INTERMEDIATE SCRUTINY UNDER *O'BRIEN*

¶ 25 As a content-neutral regulation of conduct that imposes incidental burdens on some protected expression, the Tax is constitutional so long as it passes intermediate scrutiny under the *O'Brien* test. Under *O'Brien*, a regulation of conduct is constitutional and must be upheld so long as: (1) it is within the power of the legislature to enact; (2) it furthers a substantial government interest; (3) the government interest is unrelated to the suppression of protected expression; and (4) any incidental restrictions it imposes on protected expression are

38. Utah Code Ann. § 59–27–102(4) (2008).

39. *Erie,* 529 U.S. at 296, 120 S.Ct. 1382.

40. Utah Code Ann. § 59–27–102(4) (2008) (defining a sexually oriented business as one "at which any nude or partially denuded individual ... performs any service ... during at least 30 consecutive or nonconsecutive days within a calendar year").

41. Contrary to the dissent's assertion, we have not construed the 30–day exemption as a balancing of interests. We only note that this is a legitimate view of the legislative purpose. And in light of this fact, we simply do not agree with the dissent's conclusion that the 30–day exemption establishes that the Tax's predominant purpose was the suppression of protected expression.

42. *Pap's A.M. v. City of Erie,* 553 Pa. 348, 719 A.2d 273, 279 (1998), *rev'd,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). The dissent distinguishes this case from *Erie* based on the fact that the 30–day exemption is found in the Tax's text rather than in the preamble. But this is a distinction without a difference in the context of determining whether the Tax is content based. A statute is content based if it was enacted with the predominant purpose of suppressing protected expression. Such a purpose may be divined from a preamble just as readily as from a statute's text.

43. *Erie,* 529 U.S. at 290–92, 120 S.Ct. 1382.

not greater than is essential to further the interest.[44]

▰ ¶ 26 As a threshold matter, it is important to differentiate between the *O'Brien* test for a regulation of conduct that imposes incidental burdens on some protected expression and the test for a regulation of speech that targets secondary effects.[45] Although both tests can be employed in situations that are factually similar,[46] they are two distinct tests directed at two different inquiries. The *O'Brien* incidental burdens test applies to regulations of conduct that are content neutral both on their face and as to purpose. The *Renton* secondary effects analysis applies to regulations of speech that are content based on their face but are asserted to be content neutral as to purpose. And, in a case like this one, where the parties' arguments implicate both *O'Brien* and the secondary effects analyses, understanding the distinctions between the tests is key to reaching the correct result.

▰▰ ¶ 27 As set forth by the Supreme Court, the intermediate scrutiny test from *O'Brien* applies when the regulation at issue regulates *conduct*, but the "course of conduct" to which the regulation applies contains both " 'speech' and 'nonspeech' elements." [47] In other words, the *O'Brien* test applies to statutes that regulate conduct but that include within their reach both expressive and nonexpressive conduct. The *O'Brien* inquiry is directed toward determining whether "a sufficiently important governmental interest in regulating [conduct] can justify incidental limitations on First Amendment freedoms." [48]

▰ ¶ 28 The secondary effects analysis, on the other hand, is appropriate when the regulation at issue is content based, i.e. is directed at *speech* rather than conduct, but is justified with reference to the secondary effects associated with the speech rather than the communicative content of the speech itself.[49]

▰ ¶ 29 The difference in objectives between the incidental burdens and secondary effects analyses is readily apparent. Whereas the *O'Brien* incidental burdens test is designed simply to ensure that a neutral, nontargeted regulation of conduct does not place impermissibly heavy burdens on protected expression, the inquiry in secondary effects cases is directed, at least in part, toward assessing the motive behind a facially content-based regulation of speech. When a law, on its face, regulates protected expression differently based on its content, there is a presumption that the law's purpose is to target certain speech based on its content or communicative impact.[50] In such a case, the

---

44. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

45. *See, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002).

46. *See, e.g., Erie*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (employing *O'Brien's* incidental burdens analysis); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (employing secondary effects analysis).

47. *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673.

48. *Id.*

49. *See Alameda Books*, 535 U.S. at 440–41, 122 S.Ct. 1728 (noting that the purposes of the secondary effects analysis are to "require[ ] courts to verify that the 'predominate concerns' motivating the ordinance 'were with the secondary effects of adult [speech], and not with the content of adult [speech]' ... [and to] ask whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." (quoting *Renton*, 475 U.S. at 47, 106 S.Ct. 925)); *see also R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 407 (7th Cir.2004) ("Whatever the label, *Renton's* second step is best conceived as an inquiry into the purpose behind an ordinance rather than an evaluation of an ordinance's form.").

50. *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir.2000) ("Content-based regulations by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed. Since it is the content of the speech that determines whether it is within or without the [regulation], they single out certain viewpoints or subject matter for differential treatment. These regulations draw strict scrutiny because their purpose is typically related to the suppression of free expression and thus contrary to the First Amendment imperative against

reviewing court employs the secondary effects analysis to ensure that the expressed interest in regulating secondary effects is the real motivation behind the challenged statute.[51] In contrast, there is no need, when applying the incidental burdens analysis, to evaluate the expressed interest because the determination that the regulation does not target the content of protected expression has already been made—by virtue of declaring the regulation content neutral.

¶ 30 Having set out the distinct purposes of the *O'Brien* incidental burdens analysis and the secondary effects analysis, and having determined that *O'Brien* provides the correct framework of analysis, we now analyze whether the Tax passes intermediate scrutiny under *O'Brien.*

### A. The Tax Is Within the Legislature's Power to Enact

 ¶ 31 The Tax satisfies the first prong of the *O'Brien* analysis because it is beyond question that the legislature has the authority to enact a tax to raise revenue. The Utah State Constitution expressly grants the legislature plenary authority over taxation.[52] Thus, the Tax is within the power of the legislature to enact and meets the first prong of the *O'Brien* test.

### B. The Tax Furthers the Substantial State Interest of Providing Treatment for Sex Offenders and Thereby Preventing Future Offenses

 ¶ 32 As to the second prong, we conclude that the Tax furthers a substantial government interest. While Plaintiffs acknowledge that providing treatment for sex offenders is an important government interest, they claim that the Tax fails to satisfy the second prong of the *O'Brien* test for two reasons: (1) there is not sufficient evidence supporting a connection between nude dancing establishments and sex offenders; and even if a sufficient connection did exist, (2) the Tax impermissibly attempts to address the "primary," rather than "secondary," effects of nude dancing.

¶ 33 Plaintiffs' objections regarding the lack of evidentiary connection are misplaced because they are based on the requirements of the secondary effects test rather than the *O'Brien* test. While Plaintiffs are correct in noting that the Supreme Court, in construing the "substantial state interest" prong under *Renton* and its other secondary effects cases, has required parties seeking to justify a regulation of speech under the secondary effects doctrine to establish some level of evidentiary connection between the secondary effects a regulation targets and the speech it regulates, no similar burden of proof exists under the *O'Brien* test.[53]

 ¶ 34 As set forth above, the evidentiary connection requirement for secondary effects regulations exists to provide assurance that the regulation was actually motivated by the asserted concerns over secondary effects rather than by the content of the speech itself. A review of the relevant case law shows that the second prong of the

government discrimination based on viewpoint or subject matter." (alteration in original) (citations and internal quotation marks omitted)).

51. *Alameda Books,* 535 U.S. at 440–41, 122 S.Ct. 1728.

52. Utah Const. art. XIII, § 4, cl. 1.

53. *Compare Alameda Books,* 535 U.S. at 437, 122 S.Ct. 1728 ("[T]he city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects ....") *with Erie,* 529 U.S. at 298–99, 120 S.Ct. 1382 ("Finally, it is worth repeating that Erie's ordinance is on its face a content neutral restriction that regulates conduct, not First Amendment expression.... On this point, *O'Brien* is especially instructive.

The Court there did not require evidence that the integrity of the Selective Service System would be jeopardized by the knowing destruction and mutilation of draft cards.... There was no study documenting instances of draft card mutilation or the actual effect of such mutilation on the Government's asserted efficiency interests. But the Court permitted Congress to take official notice, as it were, that draft card destruction would jeopardize the system. The fact that this sort of leeway is appropriate in a case involving conduct says nothing whatsoever about its appropriateness in a case involving actual regulation of First Amendment expression. As we have said, so long as the regulation is unrelated to the suppression of expression, the government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." (internal citation and quotation marks omitted)).

*O'Brien* test does not require that the state provide evidentiary proof of a connection between the speech it regulates and secondary effects.[54] Instead, all that is required is that the state show its regulation would advance a substantial state interest. The requirement that the interest be "substantial" simply ensures that the state's interest in adopting the legislation is sufficiently weighty to justify the incidental burdens that the regulation may place on some protected expression.[55]

■ ¶ 35 Plaintiffs' arguments relating to primary effects are misplaced for a similar reason. The primary effects of speech are the direct impacts that the speech has upon the listener or viewer—such as a change in attitude or an increased motivation to engage in certain behavior. The secondary effects of speech, on the other hand, are indirect effects associated with the speech. Secondary effects do not operate on the listener but on something else, such as the neighborhood surrounding the location where the speech occurs.[56] Plaintiffs contend that the Tax should be subject to strict scrutiny because the State has failed to justify the Tax by reference to secondary effects. Plaintiffs claim that the State has offered only the argument that people who view erotic nude dancing are more likely to commit sex offenses. Plaintiffs contend that, even if the State's assertion is true, such an effect is a primary, rather than secondary, effect of erotic nude dancing since it operates, if at all, through the impact that watching erotic nude dancing has on the viewer. Plaintiffs' argument is wholly misplaced because the distinction between primary and secondary effects of speech is only relevant when a court is evaluating the constitutionality of a content-based regulation of speech. The *O'Brien* analysis assumes the evaluated regulation will impose some burden on protected ex-

pression, which inevitably results in a burden on the primary effects of that protected expression. The whole point of the *O'Brien* analysis is to determine whether that burden is acceptable in light of the government's asserted interest in enacting the regulation. Thus, even assuming that Plaintiffs' distinction regarding primary and secondary effects is correct, this fact is irrelevant in the context of a content-neutral regulation of conduct, like the Tax, that is reviewed under *O'Brien.*

¶ 36 Finally, the mere fact that the State has referenced secondary effects as a justification for its conduct-based Tax does not convert the Tax from a content-neutral regulation of conduct into a content-based regulation of speech. In his *Erie* dissent, Justice Stevens argued that, where a government seeks to justify a regulation of conduct based, in part, on secondary effects, the regulation should be treated as a content-based regulation of speech and subjected to the secondary effects analysis:

> The Court cannot have its cake and eat it too—either Erie's ordinance was not aimed at speech and the Court may attempt to justify the regulation under the incidental burdens test, or Erie has aimed its law at the secondary effects of speech, and the Court can try to justify the law under that doctrine. But it cannot conflate the two with the expectation that Erie's interests aimed at secondary effects will be rendered unrelated to speech by virtue of this doctrinal polyglot.[57]

The plurality rejected Justice Stevens's argument, noting that

> While the doctrinal theories behind "incidental burdens" and "secondary effects" are, of course, not identical, there is nothing objectionable about a city passing a general ordinance to ban public nudity (even though such a ban may place inci-

54. *See, e.g., Erie,* 529 U.S. at 298–99, 120 S.Ct. 1382.

55. *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673.

56. *Alameda Books,* 535 U.S. at 444, 122 S.Ct. 1728 (Kennedy, J., concurring) ("Speech can produce tangible consequences: It can change minds. It can prompt actions. These primary effects signify the power and the necessity of free speech. Speech can also cause secondary ef-

fects, however, unrelated to the impact of the speech on its audience. A newspaper factory may cause pollution, and a billboard may obstruct a view. These secondary consequences are not always immune from regulation by zoning laws even though they are produced by speech.").

57. *Erie,* 529 U.S. at 326, 120 S.Ct. 1382 (Stevens, J., dissenting).

dental burdens on some protected speech) and at the same time recognizing that one specific occurrence of public nudity—nude erotic dancing—is particularly problematic because it produces harmful secondary effects.[58]

In other words, the mere fact that, in debating the Tax, legislators referenced concerns with the secondary effects associated with nudity in business does not necessarily mean—without more—that the Tax constitutes a content-based regulation of speech that must be justified either under the secondary effects doctrine or traditional strict scrutiny. The key consideration is whether the statute seeks to suppress *speech* or regulate *conduct*—not whether concerns about secondary effects played some motivational role in its enactment.

¶ 37 In this case, the record supports the conclusion that the Tax is directed toward the substantial state interest of providing treatment for sex offenders, with the twin goals of rehabilitation and prevention of future offenses. It is also clear that the Tax furthers that interest by raising revenue that is specifically directed toward sex offender treatment programs.[59] Because the Tax furthers a substantial state interest,[60] we conclude that it satisfies the second prong of the *O'Brien* test.

## C. Providing Treatment for Sex Offenders Is a Government Interest Unrelated to the Suppression of Protected Expression

■ ¶ 38 The Tax also satisfies the third prong of the *O'Brien* test—the requirement that the government interest be unrelated to the suppression of protected expression. Under Supreme Court case law, it is clear that a regulation satisfies this prong of *O'Brien* so long as its predominant purpose is not the suppression of protected expression.[61] The record before us supports the conclusion that the predominant government interest precipitating passage of the Tax was the need to provide treatment for sex offenders. This interest is unrelated to any attempt to suppress speech; indeed, as set out above, any impacts on protected speech are incidental burdens associated with the Tax's application to a general class of conduct.

## D. The Tax Is Narrowly Tailored Because It Leaves Open Alternative Means of Conveying the Erotic Message and Any Burdens It Places on Speech Are De Minimis

■ ¶ 39 Finally, the Tax satisfies the fourth prong of the *O'Brien* test as well, in that the burdens that the Tax places on protected expression are no greater than necessary. Although the Supreme Court's use of the "no greater than necessary" language in *O'Brien* appears similar to the "least restrictive means" requirement for strict scrutiny, the Court has made clear that this prong does not require the state to show that its chosen means for advancing the substantial state interest is the least restrictive means available.[62] Instead, the fourth prong of the *O'Brien* test imposes only a require-

---

58. *Id.* at 295, 120 S.Ct. 1382.

59. The Tax specifically applies a portion of the revenue raised to treatment of sex offenders through the Department of Corrections. *See* Utah Code Ann. § 59–27–105 (2008).

60. Plaintiffs point out that the tax may not *substantially further* the interest in treating sex offenders, but this is not the requirement. *O'Brien* only requires that a content-neutral regulation of conduct *further* the state's substantial interest. *Erie,* 529 U.S. at 301, 120 S.Ct. 1382 ("To be sure, requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but *O'Brien* requires only that the regulation further the interest in combating such effects."). The Tax would clearly do that here, even if the actual amount of revenue raised is small.

61. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (noting that a determination that a statute's " 'predominate' " intent was to limit negative secondary effects was "more than adequate to establish" that the government's interest was "unrelated to the suppression of free expression"); *see also Erie,* 529 U.S. at 292, 120 S.Ct. 1382.

62. *Erie,* 529 U.S. at 301, 120 S.Ct. 1382 ("In any event, since this is a content-neutral restriction, least restrictive means analysis is not required."); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 798 n. 6, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (stating that "least-restrictive-alternative analysis is wholly out of place" when evaluating content-neutral regulations of speech).

ment that the regulation be "narrowly tailored," in the sense that it "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation."[63] De minimis impacts on protected speech are permissible.[64]

¶ 40 Plaintiffs argue that the Tax fails this prong because there are less burdensome ways of addressing the state's interest in providing treatment for sex offenders and that the First Amendment requires that these methods, rather than the Tax, be used.

¶ 41 To begin with, Plaintiffs' argument suggests that O'Brien requires a regulation of conduct placing incidental burdens on some protected expression to use the least restrictive means available to serve the state's asserted interest. The Supreme Court has expressly rejected that formulation of the O'Brien test.[65] Additionally, Plaintiffs' least restrictive means argument is contrary to its own position that a general tax—one that burdens all businesses—would satisfy First Amendment scrutiny under O'Brien. A generalized tax would no doubt inflict burdens on a greater variety of protected expression than the Tax at issue here, and therefore would not be the least restrictive means available. The Supreme Court's cases have made clear that the fourth prong of O'Brien is satisfied so long as a content-neutral regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation."[66] Further, de minimis impacts on protected expression are permissible.[67]

¶ 42 In this case, the Tax promotes the interest in providing treatment for sex offenders by raising revenue and directing that revenue towards treatment programs. While there may be other, less speech-restrictive means of accomplishing the interest,

the Tax is not "invalid simply because there is some imaginable alternative that might be less burdensome on speech."[68] "The validity of [content neutral regulations of conduct] does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests."[69]

¶ 43 Additionally, any burdens the Tax imposes on protected expression are de minimis. Indeed, the Tax burdens protected expression substantially less than the public nudity ordinance upheld by the Supreme Court in Erie. The Erie ordinance imposed a blanket ban on nudity in public. The Supreme Court noted that the public nudity ban's burden on nude dancing was de minimis, since all the dancers had to do to avoid the ban was to wear G-strings and pasties.[70] The ordinance left nude dancers "ample capacity to convey [their] erotic message"[71] and only limited whatever expression that might occur "when the last stitch is dropped."[72]

¶ 44 Plaintiffs can avoid the Tax, just like the businesses in Erie could avoid the ordinance, simply by having their erotic dancers use G-strings and pasties. Additionally, the Tax places less of a burden on protected expression than the ordinance upheld in Erie in two ways. First, in contrast to the Erie ordinance, which banned all public nudity under threat of criminal sanctions,[73] the Tax neither prohibits public nudity nor imposes criminal penalties—it simply imposes an additional cost on the commercial use of nudity as a method of expression. Secondly, the 30–day exemption period further limits the Tax's burden on protected expression. The exemption period allows businesses to use nudity as a means of expression for up to 30

63. *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985).

64. *Erie*, 529 U.S. at 301, 120 S.Ct. 1382.

65. *Id.*

66. *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897.

67. *Erie*, 529 U.S. at 301, 120 S.Ct. 1382.

68. *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897.

69. *Id.*

70. *Erie*, 529 U.S. at 301, 120 S.Ct. 1382.

71. *Id.*

72. *Id.* at 294, 120 S.Ct. 1382.

73. *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273, 275–76 (1998), *rev'd*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

days each calendar year without being subject to the Tax. Since the Tax's impact on protected expression is even less burdensome than the impact of the public nudity ordinance upheld in *Erie,* we determine that the Tax satisfies the "narrow tailoring" prong of the *O'Brien* test.

¶ 45 We are unpersuaded by Plaintiffs' citation to cases such as *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*[74] and *Arkansas Writers' Project, Inc. v. Ragland*[75] for the proposition that First Amendment rights may not be taxed. To begin with, as set out above, the Tax is, on its face, a regulation of conduct. The Tax is thus meaningfully distinguishable from those struck down in *Minneapolis Star* and *Arkansas Writers' Project,* which were content-based regulations of speech.[76]

¶ 46 Additionally, neither *Minneapolis Star* nor *Arkansas Writers' Project* actually stand for the blanket proposition that a tax, whether general or differential, can never burden protected First Amendment expression. Instead, they simply confirm the already well-established rule that content-based regulations of speech are presumptively unconstitutional.[77] They also evidence an understandable concern for regulations that directly implicate the freedom of the press.[78] This is made clear by *Leathers v. Medlock,* in which the Supreme Court, in distinguishing that case from *Minneapolis Star* and *Arkansas Writers' Project,* clarified that a tax scheme that does not target specific ideas or viewpoints on its face, and that is not structured or enacted in order to impose "a penalty for particular speakers or particular ideas," does not necessarily run afoul of the First Amendment.[79] As set out above, the

Tax is neither facially discriminatory nor does the record or the Tax's structure establish that it was enacted with the predominant purpose of suppressing protected expression.

¶ 47 Finally, the taxes in *Minneapolis Star* and *Arkansas Writers' Project* were sales and use taxes imposed on the necessary materials for newspaper publishing and sales of magazines, respectively. The affected publishers could not avoid paying the taxes if they wanted to continue to operate as newspapers and magazines.[80] In contrast, Plaintiffs, and other erotic dancing clubs, can avoid the Tax and continue to operate as erotic dance clubs simply by requiring their dancers to use G–Strings and pasties. The effect on the erotic message is minimal. The Tax simply imposes a cost on using a particular means of expression rather than on the expression itself—a distinction that the Supreme Court has expressly acknowledged as significant in *Erie.*[81]

¶ 48 Accordingly, we conclude that the Tax is narrowly tailored and that it satisfies the fourth prong of the *O'Brien* test. Having determined that the Tax is a content-neutral regulation of conduct that passes the *O'Brien* test, we now turn to Plaintiffs' argument that the tax is unconstitutionally overbroad.

## III. THE TAX IS NOT UNCONSTITUTIONALLY OVERBROAD BECAUSE IT DOES NOT PROHIBIT A SUBSTANTIAL AMOUNT OF PROTECTED EXPRESSION

¶ 49 In addition to arguing that the Tax is unconstitutional under traditional First Amendment analysis, Plaintiffs contend

---

**74.** 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

**75.** 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987).

**76.** *Leathers v. Medlock,* 499 U.S. 439, 445–47, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991).

**77.** *See Leathers,* 499 U.S. at 447, 111 S.Ct. 1438 (stating that *Minneapolis Star* and *Arkansas Writers' Project* "demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints").

**78.** *See, e.g., Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. 1365.

**79.** *Leathers,* 499 U.S. at 449, 111 S.Ct. 1438.

**80.** *See Minneapolis Star,* 460 U.S. at 577, 103 S.Ct. 1365 (large circulation newspaper subjected to a use tax on the cost of paper and ink products used for publication); *Arkansas Writers' Project,* 481 U.S. at 224, 107 S.Ct. 1722 (sales tax imposed on small group of nonexempt magazines).

**81.** *Erie,* 529 U.S. at 292–93, 120 S.Ct. 1382.

that the Tax is facially unconstitutional because it is overbroad. The Supreme Court's overbreadth doctrine recognizes that a regulation that "punishes a 'substantial' amount of protected speech, 'judged in relation to the statute's plainly legitimate sweep,' " is unconstitutional on its face.[82] The overbreadth doctrine allows a plaintiff to mount a facial challenge to a statute, even if the statute, as applied to that plaintiff, is constitutional. In other words, it enables a plaintiff to challenge a statute based on how it impacts the rights of parties not before the court.[83]

¶ 50 The purpose of the overbreadth doctrine is to ensure that First Amendment rights are not impermissibly chilled by an overbroad statute.[84] Even though the person against whom an overbroad statute is enforced always has the right to mount an "as applied" constitutional challenge, the Supreme Court has justified the existence of the overbreadth doctrine on the ground that such a person may be reluctant to assert his First Amendment rights due to the cost of litigation and the potential for enforcement sanctions.[85]

¶ 51 Nevertheless, despite its important role in providing a remedy to ensure that First Amendment rights are not impermissibly chilled, the overbreadth doctrine is "strong medicine"[86] that "suffices to invalidate 'all enforcement of the law,"[87]

whether legitimate or not, and the Supreme Court has cautioned against its being "casually employed."[88] "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct."[89] The key mechanism by which the Court has prevented overuse of the overbreadth doctrine is "vigorous[ ] enforce[ment] [of] the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[90]

¶ 52 The Tax, as set out above, is narrowly tailored and, therefore, is not substantially overbroad. To begin with, the Tax regulates conduct rather than expression. The Supreme Court has stated that "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or conduct necessarily associated with speech (such as picketing or demonstrating)."[91] As described above, the Tax is a content-neutral regulation of noninherently expressive conduct and therefore falls within this class of cases.

¶ 53 Additionally, the Tax is narrowly drawn in that it is directed toward a means

---

**82.** *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**83.** *Los Angeles Police Dep't v. United Reporting Publ'g Corp.,* 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999) ("[T]he allowance of a facial overbreadth challenge to a statute is an exception to the traditional rule that 'the person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.' " (quoting *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982))).

**84.** *Hicks,* 539 U.S. at 119, 123 S.Ct. 2191 (2003) ("We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions. Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech." (internal citations omitted)).

**85.** *Id.*

**86.** *United States v. Williams,* 553 U.S. 285, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008) (internal quotation marks omitted).

**87.** *Hicks,* 539 U.S. at 119, 123 S.Ct. 2191 (emphasis in original).

**88.** *Williams,* 128 S.Ct. at 1838 (internal quotation marks omitted).

**89.** *Hicks,* 539 U.S. at 119, 123 S.Ct. 2191 (internal quotation marks omitted).

**90.** *Williams,* 128 S.Ct. at 1838 (emphasis in original).

**91.** *Hicks,* 539 U.S. at 124, 123 S.Ct. 2191.

of expression rather than expression itself. It does not prohibit the expression of any message; it simply imposes a cost on using a particular means of expressing a viewpoint— whatever the viewpoint may be.

¶ 54 Finally, the 30–day exemption period further limits the Tax's impact on protected expression. As a result, regardless of whether the Tax impacts protected expression in theater productions and nude dancing clubs, its impact on protected expression is de minimis rather than substantial. For this reason, we conclude that the Tax is not unconstitutionally overbroad.

## IV. THE STATUTORY PROVISIONS APPLYING THE TAX TO ESCORT SERVICES ARE UNCONSTITUTIONALLY VAGUE

¶ 55 In order to be unconstitutionally vague, a statute must either (1) fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," [92] or (2) be written in a way that encourages arbitrary and discriminatory enforcement.[93] As the primary trigger for applying the Tax to escort services, the term "escort" is defined in the Tax in a way that fails to provide relatively clear guidelines regarding what conduct is subject to the Tax. Accordingly, we determine that the statutory provisions applying the Tax to escort services are unconstitutionally vague.

¶ 56 The escort services provisions of the Tax are vague for the reasons enunciated by the United States Supreme Court in *City of Chicago v. Morales.* In *Morales,* the Court held that an ordinance prohibiting loitering was unconstitutionally vague when the ordinance defined "loitering" as "remain[ing] in any one place with no apparent purpose." [94] Reasoning that the City of Chicago could not

"conceivably have meant to criminalize each instance a citizen stands in public," [95] the Court concluded that the ordinance was impermissibly vague because it failed to adequately distinguish what "loitering is covered by the ordinance and what is not." [96]

¶ 57 Like the loitering ordinance in *Morales,* the statutory provisions applying the Tax to escort services fail to provide a person of ordinary intelligence guidance as to what conduct will trigger the Tax and what conduct will not. The Tax defines an "escort" as anyone who accompanies another for compensated companionship.[97] Nowhere does the statute define an escort in terms of nudity. The statute also fails to define the term "companionship." Therefore, according to the plain terms of the statute, individuals who are paid for providing care for the elderly as well as those who are paid as tour guides would fall within the definition of an "escort," and any person or business who employs them would be subject to the Tax.

¶ 58 The legislature could not conceivably have intended that companions for the elderly and tour guides would be subject to the Sexually Explicit Business and Escort Services tax. Yet, like the ordinance struck down in *Morales,* the Tax fails to provide adequate information for a person of ordinary intelligence to distinguish between those types of compensated companionship that the legislature intended would trigger application of the Tax and those that it intended would not. This ambiguity also permits arbitrary enforcement by the Commission. Accordingly, we hold that the provisions of the statute applying the tax to escort services are unconstitutionally vague.

## CONCLUSION

¶ 59 We uphold the district court's determination that the Tax is constitutional as a

**92.** *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

**93.** *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

**94.** *Id.* at 57, 119 S.Ct. 1849.

**95.** *Id.*

**96.** *Id.*

**97.** Utah Code Ann. § 59–27–102(1) (2008) (" 'Escort' means any individual who is available to the public for the purpose of accompanying another individual for: ... companionship[,] ... a salary[,] ... a fee[,] ... a commission[,] ... hire[,] ... profit, ... or ... any amount similar to an amount listed in this Subsection.").

content-neutral regulation of conduct that satisfies the *O'Brien* incidental burdens test. We also hold that it is not unconstitutionally overbroad because it does not prohibit a substantial amount of protected speech. Finally, we determine that the statutory provisions applying the Tax to escort services are unconstitutionally vague.

¶ 60 Justice WILKINS, Justice PARRISH, and Judge ORME concur in Associate Chief Justice DURRANT'S opinion.

¶ 61 Justice NEHRING does not participate herein; Court of Appeals Judge GREGORY K. ORME sat.

DURHAM, Chief Justice, dissenting in part and concurring in part:

¶ 62 I respectfully dissent in part and concur in part. I agree with the majority's analysis in Part IV that the escort and companionship provisions of the Sexually Explicit Business and Escort Service Tax (the Tax) are unconstitutionally vague. I, however, do not agree with the majority's conclusion that the Tax is content neutral and thus subject to intermediate scrutiny.

¶ 63 Despite the majority's efforts to demonstrate otherwise, this case is not the same as *Erie*. Rather, the Utah Legislature has enacted a statute that, by its own terms, makes it a content-based tax on First Amendment expressive speech; hence strict scrutiny should apply. Because the Utah State Tax Commission (the Commission) cannot show that the Tax is necessary to serve a compelling state interest and is narrowly tailored to that end, I would hold that the Tax violates the First Amendment to the United States Constitution.

## I. UNLIKE THE ORDINANCE IN *ERIE*, THE STATUTE BY ITS OWN TERMS STRATEGICALLY TAXES PROTECTED EXPRESSION AND IS THEREFORE A CONTENT–BASED TAX

¶ 64 The Tax imposes a ten percent gross receipts tax on sexually explicit businesses. Utah Code Ann. § 59–27–103 (2008). It defines a sexually explicit business as "a busi-ness at which any nude or partially denuded individual ... performs any service ... on the premises of the sexually explicit business ... during at least 30 consecutive or nonconsecutive days within a calendar year" for profit or compensation. *Id.* § 59–27–102(4).

¶ 65 Both parties agree that the nudity at issue, nude dancing, is afforded some First Amendment protection. Plaintiffs argue that the Tax is a content-based burden subject to strict scrutiny. The Commission contends that the Tax is aimed at secondary effects and is thus subject to intermediate scrutiny. Plaintiffs are correct.

¶ 66 The First Amendment to the United States Constitution protects artistic expression, which includes nude dancing. In *Barnes v. Glen Theatre, Inc.*, the Supreme Court of the United States concluded, by way of plurality, that nude dancing is entitled to some level of First Amendment protection. 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Rehnquist, C.J., O'Connor, J., and Kennedy, J., plurality) ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment ...."); *id.* at 581, 111 S.Ct. 2456 (Souter, J., concurring) ("[A]n interest in freely engaging in the nude dancing at issue here is subject to a degree of First Amendment protection."); *id.* at 592, 111 S.Ct. 2456 (White, J., Marshall, J., Blackmun, J., and Stevens J., dissenting) ("The nudity is itself an expressive component of the dance....").

¶ 67 This First Amendment protection of nude dancing is clear. It does not dissipate in the face of majority opinion or government decree. *See United States v. Playboy Entm't Group*, 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Nor is it lessened because the expression is "not very important," "shabby, offensive, or even ugly." *Id.* at 826, 120 S.Ct. 1878. Indeed, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

¶ 68 Because nude dancing is protected expression, a regulation that burdens such expression by reference to its content is a content-based regulation. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). For example, in *Playboy Entertainment*, the Court evaluated a statute designed to restrict children's viewing of sexually explicit programming. 529 U.S. at 806–10, 120 S.Ct. 1878. The Court determined that "[t]he speech in question is defined by its content; and the statute which seeks to restrict it is content-based." 529 U.S. at 811, 120 S.Ct. 1878. The statute "is not justified without reference to the content of the regulated speech." *Id.* (internal quotation marks omitted). "It focuses only on the content of the speech and the direct impact that speech has on its listeners." *Id.* (internal quotation marks omitted).

¶ 69 The Tax is a content-based regulation. It applies solely based on the narrow content of the business activity, namely, whether it involves nudity. While the Commission argues that the Tax could be applied conceptually to any type of business, this purported expansive reach does not make it content neutral. Just the opposite is true: it applies to exotic dancing but not to traditional ballet, an art exhibit, or a theatrical performance. In short, it is the content of expression that triggers the Tax.

¶ 70 Further, the Tax cannot be considered content neutral in spite of the majority's heavy reliance on *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). While the plurality in that case found the ordinance *banning all public nudity* to be content neutral, it did so according to the general applicability of the terms of the ordinance. *Id.* at 290, 120 S.Ct. 1382; *id.* at 307–08, 120 S.Ct. 1382 (Scalia, J., concurring). That ordinance, "[b]y its terms ... regulates conduct alone. *It does not target nudity that contains an erotic message;* rather, *it bans all public nudity,* regardless of whether that nudity is accompanied by expressive activity." *Id.* at 290, 120 S.Ct. 1382 (emphases added).

¶ 71 The Tax, in contrast, by its terms, creates a strategic burden by limiting its application to those "sexually explicit busi-nesses" at which nude or partially nude employees perform "during at least 30 consecutive or nonconsecutive days within a calendar year." Utah Code Ann. § 59–27–102(4)(b) (2008). Meanwhile, other businesses, such as theaters, art galleries, or dance companies, are allowed to continue their expressive activity without disruption.

¶ 72 The majority discounts this thirty-day trigger as analogous to the preamble in *Erie*, which Chief Justice Rehnquist, Justice O'Connor, Justice Kennedy, and Justice Breyer regarded as the mere expression of the city council without any legal effect and which could be construed to combat the negative secondary effects listed within the preamble. *See* 529 U.S. at 290–91, 120 S.Ct. 1382. But here it is the text of the law itself, not a preamble, that contains the thirty-day limitation and thereby, as its title and terms indicate, targets "sexually explicit businesses." And, despite the majority's attempt to characterize this case as a carbon copy of *Erie*, there is no other reasonable interpretation of the thirty-day limitation. Unlike the preamble in *Erie*, the text of the law does not identify any secondary effects nor does it support, as the majority construes it, a balancing of "the state interest in providing sex offender treatment against the incidental burdens imposed on protected expression." Therefore, this case is not like *Erie*, where "[t]here [was] no basis for the contention that the ordinance d[id] not apply to nudity in theatrical productions such as Equus or Hair" because the ordinance's "text contain[ed] no such limitation." *Id.* at 308, 120 S.Ct. 1382 (Scalia, J., concurring). Rather, the thirty-day limitation found in the text of the Tax makes it a content-based tax.

¶ 73 Indeed, if the Tax were truly content neutral, it would resemble the tax analyzed by the Colorado Court of Appeals in *Cinamerica Theatres, L.P. v. City of Boulder*, 50 P.3d 921 (Colo.Ct.App.2002). That tax "applies to all places or events ... regardless whether the activity involves protected speech and regardless of content," and taxes businesses and events "as diverse as Broadway-style dinner theater, live striptease and nude dancing, music concerts and live performances, theatrical performances, radio

shows, ballet performances, dance parties, fundraising events, bars and nightclubs, and foot races." *Id.* at 926, 928–29. Such a tax "does not affect a limited range of views and does not threaten to suppress the expression of particular ideas or viewpoints." *Id.* at 929. (internal quotation marks and alteration omitted).

¶ 74 Instead, the Tax before us treats businesses differently in reference to the content of the expression involved and does so under the guise of a thirty-day "limitation," or in other words, a de facto exemption for the more accepted forms of expression involving nudity. As Justice Kennedy explained in his concurrence in *City of Los Angeles v. Alameda Books, Inc.,* "[T]he ordinance in *Renton* treat[ed] theaters that specialize in adult films differently from other kinds of theaters. The fiction that this sort of ordinance is content neutral—or 'content neutral'—is perhaps more confusing than helpful. . . . These ordinances are content based and we should call them so." 535 U.S. 425, 448, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (second alteration in original) (internal quotation marks and citations omitted).

¶ 75 Therefore, despite the majority's analysis of the Tax under *Erie,* and without resort to the statements made by legislators in enacting the Tax, the Tax is not one of general applicability that regulates conduct alone. Rather, the Tax, by its terms, targets sexually explicit businesses that feature for thirty or more days per year the constitutionally protected expressive activity of nude dancing. Because it does so, I would hold that the Tax is content based and thus subject to strict scrutiny.

## II. THE SECONDARY EFFECTS DOCTRINE DOES NOT APPLY TO SAVE THE CONTENT–BASED TAX FROM STRICT SCRUTINY

¶ 76 Because the Tax regulates expression "based on its content, it must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Group,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Commission, however, argues that the Tax's constitutionality should be evaluated under intermediate scrutiny because it regulates based on negative secondary effects. However, the doctrine of secondary effects does not apply. The sole secondary effect the Commission identifies is sex offenses. This effect, however, lacks any empirical, reasonable connection to the viewing of nudity, which consequently makes the Tax a reaction to a primary effect.

¶ 77 Used as a time, place, and manner restriction on speech, the secondary effects doctrine has been invoked to uphold both the zoning and prohibition of nude dancing. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In applying the secondary effects doctrine, a court must verify that (1) " 'the predominate concerns' motivating the ordinance 'were with the secondary effects of adult [speech], and not with the content of adult [speech],' " and that (2) "a connection [exists] between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 440–41, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (quoting *Renton,* 475 U.S. at 47, 106 S.Ct. 925). The burden of proving secondary effects lies with the government. *Doctor John's v. Wahlen,* 542 F.3d 787, 789 (10th Cir.2008). Examples of secondary effects include, "providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects," *Erie,* 529 U.S. at 290, 120 S.Ct. 1382; "effects . . . on the surrounding community, namely . . . crime rates, property values, and the quality of the city's neighborhoods," *Alameda Books,* 535 U.S. at 434, 122 S.Ct. 1728; and "unsanitary conditions, unlawful sexual activity, and the transmission of sexually transmitted diseases," *Heideman v. S. Salt Lake City,* 165 Fed.Appx. 627, 631 (10th Cir.2006).

¶ 78 Despite the Commission's arguments to the contrary, it has failed to identify *any* secondary effect that the Tax is designed to regulate. There is no concern about property values, crime, prostitution, sexually transmitted diseases, public intoxication, or other secondary effects in the neighborhoods surrounding the businesses. All the Commis-

sion argues is the effect on sex offenders "in general," without the benefit of any data identifying or establishing such effects. Moreover, the Commission does not claim that the sex offenders' crimes were connected in some way to the neighborhoods surrounding the businesses being taxed.

¶ 79 In *Ashcroft v. Free Speech Coalition,* the Supreme Court of the United States considered the constitutionality of a prohibition on virtual images of child pornography. 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). The government had provided some evidence that individuals who view such child pornography may be predators. *Id.* at 253, 122 S.Ct. 1389. The Court held that "[t]he Government has shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse. Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage pedophiles to engage in illegal conduct." *Id.* at 253–54, 122 S.Ct. 1389.

¶ 80 As in *Ashcroft,* no more than a remote connection has been shown here. The connection identified by the Utah Legislature is that the viewing of nudity leads to the perpetration of sex offenses, and thus a tax on nudity (and the incorporated expression of nude dancing) is justified to raise funds for sex offender treatment. The legislature failed to identify any evidence of cause and effect.

¶ 81 By anecdote and assumption, the legislature concluded that perhaps one-half of sex offenders may patronize sexually explicit businesses and escort services.[1] This remote connection causes the Tax to fall within the suspected primary effect of a tax on the form of expression, rather than on any impact to the immediate locale of the taxed businesses. Aside from absence of any evidence of cause and effect, even if we were to assume that there are individuals who would attend a nude dancing performance and would commit a sex crime because of what they viewed, under *Ashcroft* those crimes would constitute a *primary* effect, not a secondary one. Because of this remote connection and lack of secondary effects, "the lesser scrutiny ... has no application to the content-based regulations targeting the primary effects of protected speech." *Playboy Entm't,* 529 U.S. at 815, 120 S.Ct. 1878. Thus the Tax must be evaluated under strict scrutiny.

## III. THE TAX FAILS STRICT SCRUTINY

¶ 82 "[A] tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech [or expression]." *Leathers v. Medlock,* 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). Content-based regulations are presumptively invalid and subject to strict scrutiny. *City of Los Angeles v.*

---

1. Although I recognize that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, ... whatever evidence the city relies upon [must be] *reasonably* believed to be relevant to the problem...." *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (emphasis added). It also requires something more than "shoddy data or reasoning" to "fairly support the [government's] rationale for its ordinance." *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion). That is not the case here. *See, e.g.,* Senate Floor Debate, H.B. 239, 55th Utah Leg., Gen. Sess. (March 2, 2004) (statement of Sen. Howard Stephenson) (explaining that from his understanding, "While most individuals who use sexually oriented businesses do not commit sex crimes, much, like most people who smoke don't get lung cancer, ... there is a link between smoking and lung cancer for those who do and there is also a link in this for some."); Hearing on H.B. 239 Before the H. Revenue & Taxation Standing Comm. (Feb. 19, 2004) (statement of Att'y Gen. Mark Shurtleff) (recounting his office's experiences with the Internet Crimes Against Children Task Force that an individual traveled from Pennsylvania to Utah to "try and have sex with a 13 year-old girl," and the individual had admitted "to a lifetime full of [being an] Internet predator using chat rooms, hurting children, attending peep shows, [and] going to Pennsylvania [for] these other types [of] sexually explicit and oriented businesses"); Hearing on H.B. 230 Before the H. Revenue & Taxation Standing Comm. (Feb. 3, 2004) (statement of Kathy Ockey) ("I can give you anecdotal information based on my experience [with the Department of Corrections], but not statistics, and my experience is I would guess about half of the sex offenders I have dealt with over the last 18 years [are patrons of the escort services]").

*Alameda Books, Inc.,* 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). And "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group,* 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

¶ 83 Under strict scrutiny, the "State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). Moreover, "[i]t is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Playboy Entm't,* 529 U.S. at 812, 120 S.Ct. 1878. This holds especially true where "[a] power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected." *Ark. Writers' Project,* 481 U.S. at 228, 107 S.Ct. 1722 (quoting *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 585, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983)).

¶ 84 The Tax fails strict scrutiny. While the State has an interest in raising revenue to fund the treatment of sex offenders, it is not in the category of government interest so compelling as to burden constitutionally protected rights. Even if it were, the Commission has failed to demonstrate any factual or empirical connection between the expressive activity taxed and the need for sex offender treatment.

¶ 85 Further, even if a compelling interest existed, the statute is not narrowly tailored to achieve that interest. As noted above, the legislature failed to identify any cause and effect between sex offenders and nude performances. For example, the legislature heard the testimony of Kathy Ockey of the Department of Corrections regarding a study by Hanson and Brussiere, which demonstrat-

ed that having a paraphilia was the third top indicator of being a sex offender. A paraphilia was defined as an unusual, obsessive sexual interest, such as women's shoes or feathers. The legislature did not choose to tax women's shoes or feathers to provide funding for sex offenders. The only other testimony offered was an anecdotal report, unsupported by data, that perhaps 50 percent of sex offenders may frequent sexually explicit businesses and escort services. However, sex offenders may also frequent restaurants, hair dressers, amusement parks, tennis clubs, and gasoline stations. Attendance or use of these services does not cause individuals to become sex offenders, and no evidence was provided that attendance or use of sexually explicit businesses and escort services cause individuals to become sex offenders. In short, the legislature failed to identify any cause and effect between sex offenders and nude dancing; without doing so, it cannot narrowly tailor its regulation.

¶ 86 Raising money for sex offender treatment is a worthy goal. Nonetheless, the legislature cannot unconstitutionally tax protected speech to obtain the money. The State has not demonstrated it has a compelling reason to tax this speech. Even if it had a compelling interest, the Tax is not narrowly tailored to achieve the interest. Therefore, the Tax is an unconstitutional burden on First Amendment protections.[2]

## CONCLUSION

¶ 87 The Tax by its own terms is a content-based tax. It is not a tax of general applicability. It is not a tax motivated and justified by secondary effects. The majority's resort to *Erie* does not convince me otherwise. Because the Tax is content based, I would subject it to strict scrutiny and consequently hold that it is unconstitutional under the First Amendment to the United States Constitution.

---

2. Because the Tax on sexually explicit businesses is unconstitutional under the First Amendment, I would not address the Plaintiffs' argument that

the statute is unconstitutional under the Fourteenth Amendment or that the statute is overbroad.